STEPHEN M. FLYNN (SBN 245823)
Law Offices of Stephen M. Flynn
2151 Main Street
Napa, CA 94559
Phone: (415) 655-6631
Fax:     (415) 655-6601
smflynn@smflynn-law.com

Attorney for Plaintiff HALCYON
SYNDICATE LTD., LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HALCYON SYNDICATE LTD., LLC, a California limited liability company doing business as "Maritime Wine Trading Collective", <br><br> Plaintiff <br><br> v. <br><br> GRAHAM BECK ENTERPRISES (PTY), LTD, a South African corporation doing business as "Graham Beck Wines", and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR:** <br><br> 1. **BREACH OF CONTRACT;** <br> 2. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** <br><br><br> **DEMAND FOR JURY TRIAL** |

1

**COMPLAINT**

**NATURE OF THE CASE**

1.  Since 2009, Plaintiff has acted as the exclusive United States importer for Defendant's wine pursuant to an implied-in-fact agreement between the parties.

2.  As evidenced by the parties' actions, conduct and course of dealing for more than a decade, the parties impliedly agreed that neither party could terminate the exclusive importation agreement without cause.

3.  Despite growing sales and Defendant's brand recognition, Defendant unilaterally and without cause abruptly terminated the importation agreement only to set up its own competing import company.

4.  Plaintiff seeks lost profits and other consequential damages arising from Defendant's breach.

**PARTIES**

5.  Plaintiff HALCYON SYNDICATE LTD., LLC, d/b/a MARITIME WINE TRADING COLLECTIVE ("MARITIME") is now and at all times mentioned was a California limited liability company located in San Francisco, California and qualified to do business in the State of California.

6.  Defendant GRAHAM BECK ENTERPRISES, LTD. ("GRAHAM BECK") is, on information and belief, a South African corporation.  Its principal place of business in in Western Cape Province, Republic of South Africa.  Defendant is and at all times mentioned was doing business throughout the State of California, including in San Francisco.

7.  Maritime is ignorant of the true names and capacities of the defendants sued herein as DOES 1 through 100, inclusive, and therefore sues these defendants by such fictitious names. Maritime will seek leave to amend this complaint to allege their true names and capacities when ascertained. Each of the fictitiously named defendants is responsible in some manner for the occurrences and damages herein alleged and are legally liable to Maritime.

8.  Each defendant individually or fictitiously named herein acted in his, her, or its right, and also was, and/or is, the agent, employee, co-conspirator, co-venturer or servant of each of the other defendants, as to each of the matters set forth herein, and each such defendant, whether individually or fictitiously named, was at all times acting within the scope and purpose of such agency, employment or

2

COMPLAINT

service, or alternatively, if the acts of each such defendant were not authorized at the time, such acts were subsequently ratified by the appropriate principal.

9.      Maritime is informed and believe, and on that basis allege, that at all times mentioned in this complaint, defendants were the agents and employees of their co-defendants, and in doing the things alleged in this complaint were acting within the course and scope of that agency and employment.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over Maritime's claims pursuant to 28 U.S.C. Section 1332(a) and (c) because Maritime is incorporated in California with its principal place of business in San Francisco, and Graham Beck is incorporated and its principal place of business in in South Africa, and the amount in controversy is in excess of $75,000, excluding interest and costs

11.      This Court has jurisdiction over Graham Beck by virtue of its extensive business dealings and transactions within this state. Graham Beck is a foreign corporation or association authorized to do business in California, or does sufficient business, has sufficient minimum contacts with or avails itself of the California market through the manufacturing, production, promotion, sale, marketing and distribution of product in California. Exercise of jurisdiction by California courts is permissible under traditional notions of fair play and substantial justice.

12.      Venue is proper in this District under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## GENERAL ALLEGATIONS

13.      Maritime is a wine importer in the business of purchasing wines primarily from wineries and producers and distributing the wine to wholesale trade throughout the United States.

14.      One of the key benefits or services Maritime offers to producers such as Graham Beck is valuable sales and marketing knowledge, a rolodex of wholesale distributors, and extensive industry experience which allows obscure foreign wine producers ( as Graham Beck once was) to find a market for their products within the United States and to grow that market and their brand awareness.

COMPLAINT

15.     Graham Beck is a wine producer located in South Africa and has been selling to the United States market and the State of California since approximately 1984.  Since 2009, Graham Beck's gross sales to the Plaintiff are several million dollars per year.

16.     In or about 2006, one of Maritime's principals was hired by Graham Beck.  At the time, Graham Beck was operating its own import company within the United States with no success. Graham Beck's then-existing import company was poorly managed, did not include a portfolio of wine and was located in Kentucky (far from the center of the United States wine industry, which is situated in the San Francisco Bay Area).

17.     Maritime's principal and Graham Beck agreed that Graham Beck's strategy and business model were not working.  With the guidance and consultation of Maritime's principal, a decision was made to shift Graham Beck's focus from still (non-sparkling) table wines to premium sparkling wines. Graham Beck now exclusively produces sparkling wines.

18.     Given the admitted failure of Graham Beck's import basis, Graham Beck and Maritime's principal agreed that he would create a new import company to be located in the wine-hub of the United States in San Francisco.

19.     It was agreed that this new company would act as Graham Beck's exclusive importer within the United States and would use their experience, sales, marketing and wholesaler relationships to grow sales and the brand.  That company would become known as Maritime and was formed in January 2009.  Graham Beck was the largest of what were just three producers initially retained by Maritime to import and market their wine within the United States.

20.     With Maritime's efforts, Graham Beck's business within the United States began to grow. With the increased sales came increased brand recognition.  Graham Beck's sparkling wines, for example, are a personal favorite of former President Obama - a fact which has been well documented in press publications internationally and is currently displayed on the walls of Graham Beck's tasting room in South Africa. The relationship was admittedly successfully and mutually beneficial, and Maritime grew part-in-parcel alongside with Graham Beck.

21.     Between 2009 and the present, Maritime's portfolio of wines grew to include producers other than Graham Beck.  However, at all times, Graham Beck remained, by far, Maritime's largest and

4

most famous producer, accounting for approximately 30-40% of Maritime's revenue.  The increased growth of Graham Beck corresponded with the growth of Maritime such that the two companies were virtually seen as one-in-the-same within the wine industry.

22.     Despite millions of dollars of sales per year, the parties' agreement was never memorialized in writing.  However, during the course of over a decade of dealings, certain understandings and implied agreements were established by the practices, customs, norms, actions, conduct and mutual understanding of the parties.  No written contract was "needed" because everyone "knew" the deal.

23.     For example, although there was no written require that they do so, the parties would meet at least annually to establish budgets, marketing plans, suggested resale prices, and strategies for the upcoming year.

24.     During the course of the year, the parties would meet, often in person, on at least a quarterly basis to review the budget, the sale reports, the projections and other issues.  Maritime was responsible for achieving the projected sales within the projected budget and was awarded bonuses for achieving the agreed upon goals.

25.     Similarly, even without a written contract, or even an oral agreement, the parties understood and agreed that Maritime was to be the exclusive importer for Graham Beck wine within the United States.  Conversely, it was understood and agreed that Maritime would not purchase any South African wine other than Graham Beck wine.  This mutual understanding was based, as alleged above, on the premise that Maritime and Graham Beck were one and the same.

26.     During over a decade of business, it was also mutually agreed, as evidenced by the actions, conduct, practices, and mutual understandings of the parties, that the import agreement could not be terminated by either party except for cause.  This was impliedly agreed and understood and reasonably relied upon by Maritime to be true.

27.     As evidence of the implied agreement concerning the term of the arrangement, five years into the relationship, on March 17, 2014, Graham Beck sent a draft importation agreement to Maritime.  Graham Beck wrote in a cover email that their standard form required "a great many amendments to bring it close to our business practice."  The substantive provisions of the agreement are, by Graham

5

**COMPLAINT**

Beck's own admission, the best evidence of the parties' implied agreement. Graham Beck staff stated the agreement was being provided "at long last" and described the agreement as an "important document."

28.     The agreement attached to Graham Beck's email was, as represented, reflective of the understandings and norms the parties had established by the parties over the preceding five years of dealing.  For example, Maritime was expressly named as the exclusive importer of Graham Beck wines within the United States and Maritime expressly was to purchase no other South African wine other than Graham Beck wine.  As was their practice, under the written agreement, the parties agreed to develop a budget, marketing strategies and pricing, and the parties mutually agreed to work together to achieve the annual sales budget and marketing plan.

29.     Given the parties' growing interdependence and success, and the amount of resources Maritime had dedicated to growing the brand, the agreement was terminable only for cause.

a.     Section 2 of the agreement provide as follows: "The period during which this agreement shall be in force shall be a period of 5 (five) years from the Effective date, being 1 July 2014 notwithstanding date of signature hereof. Renewal of this agreement shall occur automatically after the aforementioned five year period for a further 3 (three) years, subject to the provisions as to termination either during the period of five years or thereafter contained in clause 10 hereof."

b.     Section 10 of the agreements provides that Graham Beck may terminate the agreement "if the Importer commits a breach . . . and such act continues without being remedies within 21 days after written notice has been discharged, " or "if the Importer is liquidated . . or compounds with its creditors . . . ."

30.     Under the proposed contract (which, as alleged above, Graham Beck modified to reflect the parties' then unstated agreement) the relationship would continue for a five-year term followed by automatically renewing successive three-year terms (§2), and was not terminable at will, but only for cause – i.e., for an uncured default or bankruptcy by Maritime (§10).  This arrangement reflected the time, resources and money required by both parties (but especially be Maritime) to successfully bring a brand to market, expand the market, increase sales, and keep the brand relevant.

**COMPLAINT**

31.     Maritime reviewed the contract and on May 11, 2014 sent an email to Graham Beck asking if they should sign the agreement then, or wait until Graham Beck and Maritime met in the United States later in the year.

32.     Time passed, and on December 23, 2014, Graham Beck re-sent the agreement to Maritime.  In this email, Graham Beck staff stated, "as per our discussion" attached is the contract and he added that the "version was OK with us at the time . . . but should still be OK."

33.     Maritime never raised any objections to the agreement (and certainly did not object to the provisions concerning successive three-year terms after the initial five-year term, terminable only upon default or bankruptcy), but again, the parties never got around to signing the agreement.  For all concerned, growing the brand and sales took precedence over formalizing a written contract and it was difficult to get the parties together for a signing due to the fact they were operating on different continents and constantly traveling around the United States and internationally to promote the Graham Beck wines and brand.

34.     To give an example of the difficulty the parties had getting together to actually sign the contract, Graham Beck staff complained that their chief executive officer was a "shocking communicator" and was traveling in London "celebrating all sorts of things and have been incommunicado."

35.     Nevertheless, the failure to execute the 2014 draft agreement was not for a complete lack of trying.  Indeed, for the following five years, the topic would invariably come up from time to time.  Again, being concerned primarily with growing sales (not signing contracts to reflect an existing understanding), the issue was often brought to the forefront only when a third party, such as a lender or an insurer, asked for a copy of the agreement.  It was clear that the parties knew "their deal" and any written memorialization of that deal was primarily for the benefit or need of others.  As a result, the demand for a writing was one primarily driven by others, not the parties.

36.     Consistent with the notion that the term of the agreement was perpetual, terminable only for cause, it was understood and impliedly (if not expressly) agreed that Graham Beck *was* Maritime's business.  While Maritime was free to engage with new producers (as long as the same were not from South Africa), it was expected that Graham Beck's business would be the primary focus.  To this end,

7

**COMPLAINT**

Graham Beck would, from time to time, express concern or disapproval when it believed Maritime may have been dedicating too much time, effort or money to other producers.

37.     As a result of Graham Beck's growing concern with Maritime's attention being diverted to other producers, in an effort to placate Graham Beck and to further grow its business, Maritime significantly changed its business model, all with the express approval and consent of Graham Beck.

38.     Until 2016, Maritime offered the same marketing, promotion and branding services to its smaller producers that it offered to Graham Beck.  These services are what allows small or obscure foreign suppliers to gain and grow a market and demand within the United States.  Maritime's understanding of the domestic wine market, as well as its rolodex of distributors and relationships, makes this growth possible (just as occurred with Graham Beck).  As a practical matter, it was this service – as opposed to the paperwork, logistical and compliance issues normally associated with an importer – which provided the "real" value to the producer.

39.     Nevertheless, given the growing importance of the Graham Beck relationship, coupled with Graham Beck's desire to keep Maritime's primary focus on its wines, Maritime, with the consultation, approval and consent of Graham Beck, changed its business model for all its suppliers except for Graham Beck and a couple other long-term customers.

40.     Under the new business model – called "winery direct" – Maritime would act exclusively as an importer, handling purchases, sales, compliance and logistics, while removing the valuable sales and marketing component.  Removing the sales and marketing function allowed Maritime to free up its resources to dedicate itself to promoting and marketing Graham Beck's wine.

41.     This change in Maritime's business model caused some of its suppliers to leave Maritime for another company which could provide the "full service" they needed to get a foothold in the highly competitive United States wine market.  As a result, with the new "winery direct" model, Maritime was foregoing existing and potential business – as well as margins – to focus on Graham Beck wine.  Graham Beck expected Maritime to do this and thanked Maritime for its efforts.

42.     The results spoke for themselves.  Graham Beck's sales and brand awareness continued to grow.  For the first time since its inception in the 1980's Graham Beck was making money from the sale of its wines.  Demand for Graham Beck wines grew so much in the United States that, at times,

**COMPLAINT**

Graham Beck was unable to provide the wine necessary to keep Maritime's customers with stock sufficient to fulfill market demand.

43.     This growth was unprecedented for a South African wine, virtually all of which have failed to gain any foothold within the United States market.  Indeed, it is not an understatement to say that Graham Beck wines are, within the United States, synonymous with South African wine.

44.     During the course of their relationship, Maritime was approached by other South African producers who asked Maritime to do for them, what it had done for Graham Beck.  Maritime, of course, declined this business based on the understanding that Graham Beck was to be its only South African producer.

45.     So great was Graham Beck's growth that on April 4, 2019, Kobie Lockner at Graham Beck wrote Maritime to say "This is amazing results! Thanks to you and everyone at Maritime who are putting in the effort to achieve these numbers."

46.      Unbeknownst to Maritime, after it had changed its' business model, and at the very same time Graham Beck was congratulating it for its "amazing results," the Beck family was using its tremendous wealth working behind the scenes to set up its own import company within the United States.  None of this was disclosed to Maritime.

47.     On June 14, 2019, Chris Du Toit, Graham Beck's new chief executive officer, sent a notice of termination, ending the parties' relationship on a mere three-month's notice.  According to du Toit, in the absence of a written contract, "a three month notice period of cancellation [is] fair, reasonable and in line with industry standards."

48.     In the letter, du Toit admitted that the relationship was "very good and mutually beneficial" and recognized that "substantial investments have been made to increase quality, volume, and efficiency" and that, as a result, the "Beck family are experiencing tremendous growth." Nevertheless, Graham Beck wanted to usher in a "new phase" and that the "Beck family is therefore setting up its own import and sales company to oversee the sales of all its family's brands in the USA."

49.     Despite the fact the termination was not to take place for three months, Graham Beck immediately began reaching out to wholesale distributors within the United States, both informing them of the "new phase" and even placing orders directly with those distributors.

9

**COMPLAINT**

50.     Graham Beck's actions post-termination not only under-cut sales Maritime otherwise would have made, but it also damaged relationships Maritime had with its network of distributors and buyers.  Without good relationships with its network of distributors and buyers, Maritime would cease to exist as a company.

### FIRST CAUSE OF ACTION

### Breach of Implied-In-Fact Contract

### (Against Graham Beck and Does 1 Through 100)

51.     Maritime incorporates by reference all of the allegations contained in the Paragraphs above as though fully set forth herein.

52.     A contract may be express or implied.  A contract may be stated in words, either oral or written, or may be inferred wholly or partly from conduct.  An implied-in-fact contract is one, the existence and terms of which are manifested by the acts and conduct of the parties, interpreted in the light of the subject-matter and of the surrounding circumstances. There is no legal difference between an express contract and an implied-in-fact contract.

53.     The parties entered into an implied-in-fact agreement whereby Maritime would act as the exclusive importer for all Graham Beck wines within the United States.

54.     As a part of that implied-in-fact contract, the parties impliedly agreed that the agreement would be terminable only for cause, such as an uncured default or the insolvency of Maritime.  The implied-in-fact agreement, including the perpetual term, terminable only for cause, was is evidenced by the actions, conduct, norms, practices, customers, and understandings of the parties as alleged above.

55.     Maritime has performed all conditions, covenants, and promises required by it to be performed in accordance with the terms and conditions of the implied-in-fact contract.

56.     Graham Beck breached the implied-in-fact contract by abruptly terminating the implied-in-fact contract without cause.  Graham Beck further breached the implied-in-fact contract by announcing the termination to United States wholesale distributors and by selling wine directly to those wholesale distributors within the United States.

57.     By reason of Defendant's breach of the Contracts, Plaintiff has suffered damages of at least approximately $3,000,000, subject to proof at trial.

---

**COMPLAINT**

## SECOND CAUSE OF ACTION

### Breach of Implied- Covenant of Good Faith and Fair Dealing

### (Against Graham Beck and Does 1 Through 100)

58.     Maritime incorporates by reference all of the allegations contained in the Paragraphs above as though fully set forth herein.

59.     The parties entered into an implied-in-fact agreement whereby Maritime would act as the exclusive importer for all Graham Beck wines within the United States.

60.     In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other party to receive the benefits of the agreement.

61.     Each party to a contract has a duty to do everything that the contract presupposes that he will do to accomplish its purpose and a duty not to prevent or hinder performance by the other party.

62.     Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.

63.     Even if the conduct, actions, norms and understandings of the parties does not evidence an implied agreement that the term of the agreement would be perpetual, terminable only for cause, at the very minimum the implied covenant of good faith and fair dealing requires a "reasonable notice" before the parties agreement could be terminated.

64.     Where the nature of the contract and the totality of the circumstances give no suggestion as to any ascertainable term, the term of duration shall be at least a reasonable time and the contract shall be terminable at will upon reasonable notice.

65.     Given the relationship of the parties, their course of conduct, the nature and interdependency of the business between Graham Beck and Maritime, and Maritime's reliance upon a long-term relationship, as alleged above, as well as customers and industry standards within the wines business, a "reasonable notice" in circumstance such as these is no less than three years.

66.     Maritime has performed all conditions, covenants, and promises required by it to be performed in accordance with the terms and conditions of the implied-in-fact contract.

**COMPLAINT**

67.     Graham Beck breached the implied covenant of good faith and fair dealing by abruptly terminating the implied-in-fact contract without cause on just three months' notice.  Graham Beck further breached the implied-in-fact contract by announcing the termination to United States wholesale distributors and by selling wine directly to those wholesale distributors within the United States.

68.     By reason of Defendant's breach of the Contracts, Plaintiff has suffered damages of at least approximately $3,000,000, subject to proof at trial.

<b>PRAYER FOR RELIEF</b>

THEREFORE, Plaintiffs ask the Court to enter the following judgment:

1. For general, special and actual damages of at least approximately $3,000,000, subject to proof at trial;

2. For incidental and consequential damages according to proof at trial;

3. For prejudgment interest at the legal rate;

4. For costs of suit and out-of-pocket expenses; and

5. For such other and further relief as the Court may deem just and proper.


Respectfully submitted,

DATED: July 25, 2019                          **LAW OFFICES OF STEPHEN M. FLYNN**


_____/s/_____
Stephen M. Flynn
Attorney for Plaintiff HALCYON SYNDICATE
LTD., LLC d/b/a MARITIME WINE TRADING
COLLECTIVE

**COMPLAINT**

1

**DEMAND FOR JURY TRIAL**

2

Plaintiff demands a trial by jury on all issues so triable

3

4

Respectfully submitted,

5

6   DATED: July 25, 2019                              **LAW OFFICES OF STEPHEN M. FLYNN**

7

_____/s/_____

8                                                     Stephen M. Flynn
                                                      Attorney for Plaintiff HALCYON SYNDICATE
9                                                     LTD., LLC d/b/a MARITIME WINE TRADING
                                                      COLLECTIVE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**