UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HALCYON SYNDICATE LTD., LLC, <br><br> Plaintiff, <br><br> v. <br><br> GRAHAM BECK ENTERPRISES (PTY), LTD., <br><br> Defendant. | Case No.  19-cv-04278-JCS <br><br> **ORDER DENYING MOTION TO DISMISS** <br><br> Re: Dkt. No. 30 |

## I.      INTRODUCTION

Plaintiff Halcyon Syndicate Ltd., LLC, d/b/a Maritime Wine Trading Collective ("Maritime"), which is based in San Francisco, California, asserts claims for breach of implied-in-fact contract and breach of implied covenant of good faith and fair dealing against wine producer Graham Beck Enterprises, Ltd., ("Graham Beck"), which is located in South Africa, based on Graham Beck's termination of the business relationship between the two companies.  Presently before the court is Defendant's Motion to Dismiss ("Motion"), in which Graham Beck moves the Court to dismiss the current action pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), 12(b)(6) and *forum non conveniens*, asserting that the Court lacks personal jurisdiction over Graham Beck, that venue in this District is improper, that South Africa (where an action between the same parties is also pending) is a more appropriate forum, and that Maritime insufficiently alleged its claims.  The Court held a hearing on the Motion on Friday, July 17, 2020. For the reasons set forth below, the Court finds that it has personal jurisdiction over Graham Beck, that venue is proper in the Northern District of California, that Maritime has sufficiently alleged its claims, and that *forum non conveniens* dismissal is not warranted.  Accordingly, the Motion is DENIED.[1]

---
[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

## II.     BACKGROUND

### A.     Procedural Background

Maritime filed the Complaint in this action on July 25, 2019 asserting subject matter jurisdiction on the basis of diversity under 28 U.S.C. § 1332(a). [2]  On October 7, 2019, Graham Beck filed suit against Maritime in the High Court of South Africa (Western Cape Division, Cape Town) in an action captioned as *Graham Beck Enterprises (PTY) Ltd. v. Halcyon Syndicate Ltd.*, South Africa, Case No. 16996/2019 (hereinafter "South Africa Action"), to recover approximately $883,678.80 (in U.S. dollars) in trade debt allegedly owed by Maritime.  *See* Declaration of Chris du Toit in Support of Defendant Graham Beck's Motion to Dismiss du Toit ("du Toit Decl.") ¶ 27 & Ex. I (Graham Beck's Amended *Intendit*).  Maritime filed a Notice of Intention to Defend in the South Africa Action dated October 29, 2019. [3]  *Id.* ¶ 29 & Ex. J (Maritime's Notice of Intention to Defend).   On April 29, 2020 Graham Beck filed the instant motion.

### B.     The Complaint

Maritime alleges that the relationship between the parties began in 2006, when Graham Beck hired Christopher Nickolopoulos, who is now the chief executive officer of Maritime, as Graham Beck's North American Business Director.  Complaint ¶ 16.  At that time, Maritime alleges, Graham Beck was operating its own import company within the United States, in Kentucky, "with no success." *Id.* ¶ 17.   Maritime alleges that the parties agreed that Nickolopoulos would start a new import company, which would be based in San Francisco ("the

---

[2] Maritime alleges that the parties are diverse because Maritime is incorporated in California with its principal place of business in San Francisco and Graham Beck is incorporated in South Africa and has its principal place of business there as well.  Complaint  ¶ 10.  However, Maritime is an LLC, which means that there is diversity jurisdiction only if all the members of the LLC are diverse from Graham Beck. *See Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) ("We therefore join our sister circuits and hold that, like a partnership, an LLC is a citizen of every state of which its owners/members are citizens.").  At oral argument, the parties stipulated that no member of Maritime is a citizen of South Africa and therefore that there is complete diversity in this action.  It is undisputed that the $75,000 amount-in-controversy requirement is satisfied.

[3] At the hearing on the instant motion, the parties confirmed that the South Africa Action is still pending.  The parties were unable to provide any information about the degree to which the courts in South Africa are functioning during the Covid-19 emergency.  It appears that there have been no substantive developments in the South Africa Action since briefing was completed on the instant motion.

center of the United States wine industry") and "act as Graham Beck's exclusive importer within the United States and would use [its] experience, sales, marketing and wholesaler relationships to grow sales and the brand." *Id.* ¶¶ 16, 19.  That new company "would become known as Maritime and was formed in January 2009." *Id*.  Maritime alleges that Graham Beck's business in the United States grew as a result of its efforts, with increased sales and growing brand recognition of Graham Beck's products. *Id.* ¶ 20.

Maritime alleges that between 2009 and 2019, "certain understandings and implied agreements were established by the practices, customs, norms, actions, conduct and mutual understanding of the parties." *Id*. ¶ 22.  According to Maritime, "[n]o written contract was 'needed' because everyone 'knew' the deal." *Id*.  For instance, although there was no written requirement that they do so, the parties met "at least annually to establish budgets, marketing plans, suggested resale prices, and strategies for the upcoming year." *Id.* ¶ 23.  Maritime further alleges that the parties met quarterly to discuss the progress of the goals of the parties and that Graham Beck awarded Maritime bonuses for meeting the projected sales within the projected budget. *Id.* ¶ 24.

Maritime alleges that even without a written contract, the parties had an understanding that Maritime would be the exclusive importer of Graham Beck's wines, and that Maritime would not import any South African wines other than Graham Beck's. *Id.* ¶ 25.  It also alleges that the parties knew and understood that this agreement could not be terminated without cause. *Id.* ¶ 26.  As evidence of the implied agreement, Maritime points to a draft importation agreement that Graham Beck sent to Maritime via email on March 17, 2014 ("2014 Draft Agreement"). *Id.* ¶ 27.  Maritime alleges that the substantive provisions of this agreement were, by Graham Beck's own admission, the best evidence of the parties' implied agreement. *Id.* ¶ 27.  According to Maritime, Graham Beck stated in the email that accompanied the draft contract that its "standard form required 'a great many amendments to bring it close to our business practice.'" *Id*.

Maritime's complaint points to several specific substantive provisions of the 2014 Draft Agreement that it alleges reflect the implied agreement between the parties. *Id.* ¶¶ 28-30.  For example, "Maritime was expressly named as the exclusive importer of Graham Beck wines within

the United States and Maritime expressly was to purchase no other South African wine other than Graham Beck wine." *Id.* ¶ 28.  The 2014 Draft Agreement further provided that the parties would develop a budget, marketing strategies and pricing and that the parties would work together to achieve the annual sales budget and marketing plan, consistent with the parties' existing practice. *Id.*  According to Maritime, the 2014 Draft Agreement also provided that it could be terminated only for cause, in recognition of the "growing interdependence and success, and the amount of resources Maritime had dedicated to growing the brand." *Id.* ¶ 29;  *see also id.*¶ 30 ("This arrangement reflected the time, resources and money required by both parties (but especially be Maritime) to successfully bring a brand to market, expand the market, increase sales, and keep the brand relevant.").   In particular, Section 2 of the agreement provided for an initial 5-year term, with automatic renewal for another 3-year period, subject to the termination provision in Section 10.  *Id.*  Section 10 provided that Graham Beck could terminate the agreement "if [Maritime] commits a breach . . . and such act continues without being remedied within 21 days after written notice has been discharged," or "if the Importer is liquidated . . or compounds with its creditors . . . ." *Id*.

Maritime alleges that it reviewed the contract and on May 11, 2014 sent an email to Graham Beck asking if it should sign the agreement then or wait until Graham Beck and Maritime met in the United States later in the year.  *Id.* ¶ 31.  Graham Beck again sent the contract to Maritime on December 23, 2014, stating in the email that accompanied it, "'as per our discussion' attached is the contract" and adding that "the 'version was OK with us at the time . . . but should still be OK.'"  *Id.* ¶ 32.  Maritime alleges that it never objected to the 2014 Draft Agreement and that the parties simply "never got around to signing the agreement." *Id.* ¶ 33.  According to Maritime, "[f]or all concerned, growing the brand and sales took precedence over formalizing a written contract and it was difficult to get the parties together for a signing due to the fact they were operating on different continents and constantly traveling around the United States and internationally to promote the Graham Beck wines and brand."  *Id*.

Maritime alleges that Graham Beck breached the parties' implied contract when on June 14, 2019, Chris du Toit, Graham Beck's new chief executive officer, sent a notice of termination,

United States District Court
Northern District of California

ending the parties' relationship on three-month's notice. *Id.* ¶¶ 47, 56.  Additionally, Maritime alleges that Graham Beck began reaching out to new distributors even before the three-month period discussed in the notice and that Graham Beck's post-termination actions damaged Maritime's business by disrupting its relationships with its network of distributors and buyers. *Id.* ¶¶ 49-50.

Maritime alleges that "[e]ven if the conduct, actions, norms and understandings of the parties does not evidence an implied agreement that the term of the agreement would be perpetual, terminable only for cause, at the very minimum the implied covenant of good faith and fair dealing requires a 'reasonable notice' before the parties agreement could be terminated." *Id.* ¶ 63. Under the circumstances, it alleges, reasonable notice required that Maritime be given at least three years notice of Graham Beck's intent to terminate the parties' agreement. *Id.* ¶ 65.

Maritime alleges that it has fully complied with the terms of the parties' implied agreement and that Graham Beck breached the implied covenant of good faith and fair dealing by abruptly terminating the implied agreement without cause on just three months' notice. *Id.* ¶¶ 66-67.  It alleges that Graham Beck further breached the implied-in-fact contract by announcing the termination to United States wholesale distributors and by selling wine directly to those wholesale distributors within the United States. *Id.* ¶ 67.  As a result, Maritime alleges it has suffered damages of at least $3,000,000. *Id.* ¶ 68.

### C.    The Motion

Graham Beck contends dismissal is required under Rule 12(b)(2) because it does not have systematic and continuous contacts with the state of California sufficient to confer general jurisdiction over it and Maritime has not alleged sufficient facts to establish specific jurisdiction. *Id.* at 9.[4]  It further asserts that venue is improper pursuant to Rule 12(b)(3) and 28 U.S.C. § 1391(b) because no event giving rise to the action occurred in the Northern District of California. *Id.* at 20-21.  Graham Beck contends that the events that gave rise to Maritime's claims did not occur within the Northern District of California and emphasizes that Maritime purchased and took

---

[4] As Maritime does not dispute that there is no jurisdiction under the doctrine of general jurisdiction, the Court addresses only specific jurisdiction in its Order.

possession of its wines in South Africa.  *Id*. at 22.  Graham Beck also maintains that under

§1391(b)(3), which provides that venue is proper in "any judicial district in which any defendant

is subject to the court's personal jurisdiction with respect to such action," venue is improper

because that section only applies if  "there is no district in which an action may otherwise be

brought."  *Id*.  Graham Beck contends the action may be brought in South Africa and therefore,

that this subsection does not apply.  *Id*.

  Graham Beck further contends a choice of law provision in the 2014 Draft Agreement and

a forum selection clause in a 2018 unsigned agreement ("the 2018 Draft Agreement"), discussed

further below, support the conclusion that venue in South Africa rather than in the Northern

District of California is proper.  *Id*. at 22-24. Graham Beck points out that Maritime itself relies on

the 2014 Draft Agreement in its Complaint, arguing that Maritime must accept that South African

law applies because it relies on the 2014 Draft Agreement.  *Id.* at 23.

Even if venue is proper, Graham Beck contends, the action should be dismissed under the

doctrine of *forum non conveniens* because:  1) there is an adequate alternative forum; and 2) the

balance of private and public interest factors favors dismissal.  *Id*. at 27.   In particular, it contends

that South Africa is an adequate (and even preferable) forum because there is already an action

pending there and Maritime's claims are governed by the law of South Africa pursuant to the

choice of law provision in the 2014 Draft Agreement.  *Id*. at 28.  Graham Beck also points to the

forum selection clause in the 2018 Draft Agreement, to which Maritime did not object.  *Id*.

Graham Beck further points to the fact that Maritime has not yet objected to jurisdiction in South

Africa, though it concedes in a footnote that the "Covid-19 lockdown has resulted in Graham Beck

being unable to file the necessary documents that would enable Maritime to plea on the full claim

[and that] Maritime will have the opportunity to object to jurisdiction when filing such a plea."  *Id*.

n. 11.

Graham Beck also argues that private and public interest factors weigh in favor of

dismissal under the doctrine of *forum non conveniens.  Id*. at 29-30.  With respect to private

interest factors, it contends more witnesses are based in South Africa and "[t]he majority of the

documents in this case are likely to be located in South Africa."  *Id*. at 28-29.  It also points out

that Maritime refers to itself as an "importer" in the Complaint.  *Id*. at 29 (citing Complaint ¶ 13).  With respect to public interest factors, it asserts that "the public in the San Francisco Bay Area are not likely to have a significant interest in South African contract law, as it is unlikely to impact any of its residents;" that "a South African tribunal is more likely to be familiar with its own law than a San Francisco court;" and that this court is "likely to be severely overburdened when it returns to business as usual" after the Covid-19 emergency has ended.  *Id*. at 30.  It further asserts that "it would be much more efficient to have both cases heard" in South Africa and that no party will be prejudiced if the cases are consolidated in South Africa because this case is in its early stages.  *Id*.

Finally, Graham Beck argues that Maritime's claims must be dismissed under Rule 12(b)(6) because Maritime has failed to sufficiently allege its claims for breach of implied contract and breach of the duty of good faith and fair dealing.  *Id*. at 24-25.  First, Graham Beck contends Maritime cannot state a claim for breach of an implied contract where there is a written contract that expresses the terms of the agreement (the 2014 Draft Agreement) and Maritime itself relies on that written agreement in its Complaint.  *Id*. at 24.  Graham Beck cites the "well-established" rule that "'an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter.'" *Id*. (citing *Lance Camper Mfg. Corp. v. Republic Indem. Co*., 44 Cal. App. 4th 194, 203 (1996)).  Second, Graham Beck contends that Maritime failed to sufficiently plead its claim of breach of the duty of good faith and fair dealing because Maritime failed to allege that Graham Beck acted with specific intent to frustrate the purpose of the agreement.  *Id.* at 26 (citing *Carma Develop. (Cal.), Inc. v. Marathon Develop. Cal., Inc.*, 2 Cal. 4th 342, 373 (1992)).  Graham Beck also asserts that Maritime owes Graham Beck over $800,000 in trade debt (the subject of the South Africa action) and therefore cannot establish that Graham Beck's termination was in bad faith.  *Id.* at 27.

In support of the Motion, Graham Beck submitted declarations by: 1) its Chief Executive Officer ("CEO") Chris du Toit; 2) Connie Hale, the manager of a Kentucky company owned by Graham Beck's son, Antony Beck, called Gainesway Management Corporation;  3) Sunny Sarkis, an attorney who represents Graham Beck in this action.

In his declaration, du Toit states that since 2009, Maritime "has been the independent wine importer for Graham Beck Enterprises in the United States." du Toit Decl. ¶ 4.  du Toit provides a copy of an unsigned and undated agreement entitled, "Appointment of Importer with Exclusive Rights," between Graham Beck and Maritime.  *Id.* ¶ 5 & Ex. A. The parties stipulated at oral argument that this document is the same agreement Maritime alleges in the Complaint is the "best evidence of the parties' implied agreement," which the Court refers to as the 2014 Draft Agreement.  *See* Complaint ¶ 27.  du Toit quotes Section 16[5] of the 2014 Draft Agreement, which states:

> Regardless of the place of execution, performance or area in which the Parties are domiciled, this agreement and all modifications and amendments thereof shall be governed by and construed under and in accordance with the laws of South Africa.

*Id.*  According to du Toit, no one at Maritime objected to Section 16 or any other provision of the 2014 Draft Agreement.  *Id.* ¶ 6.

du Toit also provides a copy of  Promissory Note for a loan by Graham Beck to Maritime in the amount of $528,697.10, as well as a "Personal Guaranty of Collection" (the "Personal Guaranty") for the benefit of Graham Beck signed by Maritime's principal, Nickolopoulos; both documents are dated September 30, 2010 and specify that California law will govern the agreements. *Id.* ¶ 7 & Ex. 2.

Further, du Toit states that in December 2017 and January 2018 the parties "re-negotiated a 'Contract for Distribution.'"  *Id.* ¶ 8.  According to du Toit, the last version of that agreement was sent by Kobie Lochner (Graham Beck's export manager, who is based in South Africa) to Nickolopoulos (Maritime's CEO) and was dated January 8, 2018.  *Id.* ¶¶ 8, 26 & Ex. C ("2018 Draft Agreement").  The 2018 Draft Agreement provided in Section 14:

> Law applicable and competent court
>
> The parties submit all their disputes arising out of or in connection with this Agreement to the exclusive jurisdiction of the Courts of the Republic South Africa.

*Id.*, Ex. C (2018 Draft Agreement).  According to du Toit, "[a]t no time did Maritime voice any

---

[5] In the Motion, this section is referred to as Section 14.  *See* Motion at 22.  The Court finds that this is a clerical error.

United States District Court
Northern District of California

objections to the foregoing forum selection clause." *Id.* ¶ 10.

In describing Graham Beck's connection to California, du Toit states that: 1) "Maritime placed orders for Graham Beck's products via purchase orders for wines;" 2) "Graham Beck received orders from Maritime in South Africa . . . [and] then transported its product to the Cape Town harbor, where the products were delivered free on board to Maritime, who paid for shipping, shipping insurance, and arranged all shipping logistics;" 3) "Business planning for sales to Maritime, including but not limited to determination of payment terms, sales, and operational budgets, originated in South Africa . . . [and] Graham Beck prepared the monthly statements of shipments and accounts in South Africa;" 4) "All of Graham Beck's products are produced in South Africa;" 5) "Graham Beck does not advertise in California;" 6) "Graham Beck does not have an office in California . . . [and] does not lease or own any real estate in California;" 7) "Graham Beck does not have an agent for service of process in California;" and 8) "Graham Beck does not have any employees in California." *Id.* ¶¶ 11-17.

du Toit concedes that he "occasionally" has traveled to California to conduct business, describing three two-day visits to San Francisco in 2017 and 2018 for meetings conducted at Maritime's San Francisco office. *Id.* ¶¶ 18-21. According to du Toit, his last trip to the United States was in June 2019, when he and Kobie Lochner met with Nickolopoulos in Colorado to give verbal notice of "cancellation of the business arrangement" between Graham Beck and Maritime. *Id.* ¶ 22. du Toit states that he has not returned to the United States since that time and that he has no plans to visit California in 2020. *Id.* ¶ 23. du Toit also attaches to his declaration a copy of the June 14, 2019 letter in which Graham Beck "terminated its business relationship with Maritime." *Id.* ¶ 24 & Ex. H. In that letter, du Toit stated that in light of the fact that there was no written contract, Graham Beck had determined that three-months' notice of termination was "fair, reasonable, and in line with industry standards" and therefore was giving three-months' notice of termination effective from July 1, 2019. *Id.* Ex. H.

du Toit states that the following witness in this case are based in South Africa: "(i) Kobie Lochner (export manager); (ii) Etienne Heyns (erstwhile marketing and sales manager); (iii) Pieter Ferreira (cellar master); (iv) Herman Mostert (CFO); (v) Nicol Currin (commercial manager); (vi)

Chris du Toit (CEO); (vii) Pierre de Klerk (winemaker); and (viii) Lizelda van der Merwe (logistics)." *Id*. ¶ 26.

Graham Beck also supplies a declaration by attorney Sunny Sarkis, who is counsel of record in this action.  According to Sarkis, Maritime initially attempted to serve Graham Beck in Kentucky but was unable to effect service there; ultimately, Maritime served Graham Beck at its place of business in South Africa.  Declaration of Sunny Sarkis in Support of Graham Beck's Motion to Dismiss Pursuant to Federal Rules 12(b)(2), 12(b)(3), 12(b)(6) and Forum Non Conveniens ("Sarkis Decl.") ¶ 3.  Sarkis also describes Maritime's responses to discovery propounded by Graham Beck in this action.  *Id*. ¶¶ 4-8. According to Sarkis, in response to Graham Beck's Interrogatory No. 14, which "requested that Maritime identify all individuals at Maritime who made objections to the South African forum selection clause in the 2018 contract" Maritime stated "that it did not voice any objections to venue or any other clause in the draft contracts which were not signed by either party." *Id*. ¶ 6 & Ex. A.  Sarkis states that in response to Graham Beck's Interrogatory No. 19, which "requested that Maritime identify all objections made by Maritime on the basis of *forum non conveniens* in the action for collection of trade debt pending in South Africa" "Maritime stated that as of March 13, 2020, it had not made objections on the basis of venue" in the South Africa Action and further stated that "it has no personal knowledge of whether South Africa even has a *forum non conveniens* doctrine." *Id*. ¶ 7 & Ex. A. Finally, Sarkis states that in response to Graham Beck's Interrogatory No. 23, which requests that Maritime "identify all witnesses in San Francisco that are likely to have relevant information concerning the instant litigation" Maritime identified Elijah Pfister, Christopher Nickolopoulos, Birgit Brunar, and Taylor Lew." *Id*. ¶ 8 & Ex. A.

Graham Beck also provided a declaration by Connie Hale, the manager of a company in Kentucky owned by Antony Beck, the son of the founder of Graham Beck.  Declaration of Connie Hale, CPA, CGMA, in Support of Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), 12(b)(6), and Forum Non Conveniens ("Hale Decl.").  Hale states that Antony Beck is not authorized to accept service on behalf of Graham Beck and was not authorized to do so in 2019.  Hale Decl. ¶¶ 9-10.  She further states that Antony Beck "does not actively

participate in the daily operations of Graham Beck Enterprises." *Id*. ¶ 9.

### D. The Opposition

In its Opposition, Maritime argues that this Court may exercise specific jurisdiction over Graham Beck because Graham Beck has intentionally reached out beyond South Africa to do business with the forum state and because Graham Beck has failed to meet its burden of demonstrating that exercising personal jurisdiction in this case would be unreasonable. Opposition at 10-11. Maritime relies heavily on the Ninth Circuit's decision in *Taubler v. Giraud*, 655 F.2d 991 (9th Cir. 1981), which it contends is directly on point. *Id*. at 12-13. It also points to *Santa Margherita, S.P.A. v. Weine KG.*, Case No. CV 12-03499, 2013 WL 12125539 (C.D. Cal. Aug. 28, 2013), which it contends also involved facts similar to the facts of this case. *Id*. at 14. In both cases, Maritime contends, the courts found that there was personal jurisdiction over foreign wine producers for reasons that also apply in this case. *Id*. Finally, Maritime asserts that *Marcus Food Company v. Di Panfilo*, 671 F.3d 1159 (10th Cir. 2011) and *Luberski, Inc. v. Oleificio F.LLI Amato S.R.L.*, 171 Cal. App. 4th 409 (2009) are on point and support the conclusion that there is personal jurisdiction in this case. *Id*. at 14-16.

Maritime further asserts that venue is proper because Graham Beck's wine was purchased, marketed and promoted in California, which is also where Graham Beck sent its termination notice. *Id*. at 19. Alternatively, it argues that fallback venue is proper under §1391(b)(3), which provides that venue is proper in "any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action," for the same reason there is personal jurisdiction over Graham Beck. *Id*. at 20. Maritime rejects Graham Beck's argument that subsection (b)(3) does not apply because the case can be brought in South Africa, arguing that the term "judicial district" as used in §1391(b) refers to a *federal* district court, not a foreign court. *Id*. (citing *Atlantic Marine Const. Co. v. U.S. Dist. Court for Western Dist. of Texas*, 571 U.S. 49, 57 (2018)).

Maritime argues further that Graham Beck has not established that dismissal is warranted under the doctrine of *forum non conveniens* because it has not made a clear showing of "oppression and vexation" and has not demonstrated that either public or private interest factors

warrant dismissal.  *Id*. at 20-23 (quoting *Boston Telecommunications Group, Inc. v. Wood*, 588 F.3d 1201, 1212 (9th Cir. 2009)).   With respect to private factors, Maritime contends Graham Beck and the Beck family have significantly more resources than Maritime and therefore, that litigating in this Court would be less burdensome for Graham Beck than litigating in South Africa would be for Maritime.  *Id*. at 21 (pointing to websites that allegedly show that "Graham Beck was a billionaire" and that Anthony Beck has "residences around the world, including in the Hamptons and his primary residence, a 1,500-acre Kentucky thoroughbred estate.").  It also challenges Graham Beck's assertion that much of the evidence in the case is likely to be in South Africa, countering that the vast majority (if not all) of the relevant documents are stored electronically stored and therefore equally available in both places.  *Id*. at 21-22.  As to the eight witnesses Graham Beck has identified, Maritime contends they do not support Graham Beck's position because Graham Beck has not explained why the testimony of these witnesses was significant or address whether the witnesses could be compelled to testify in this Court.  *Id*. at 22.  According to Maritime, the "key witnesses" are Nickolopoulos and Pfister (who are California residents) and Antony Beck (a Kentucky resident);  California residents Taylor Lew and Bridgit Brunar are also expected to offer testimony as to the parties' course of dealing.  *Id*. at 22 n. 15.  Maritime also notes that Graham Beck failed to offer authority to support its contention that Maritime's role as an "importer" has any impact on the analysis.  *Id.*

With respect to the public interest factors, Maritime contends California clearly has an interest in protecting its residents and enforcing contracts made by its residents.  *Id*. (citing *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1200 (9th Cir. 1988);  *Brand v. Menlove Dodge*, 796 F.2d 1070, 1075 (9th Cir. 1986); *Advanced Skin & Hair, Inc. v. Bancroft*, 858 F. Supp. 2d 1084, 1091 (C.D. Cal. 2012);  *Taubler v. Giraud*, 655 F.2d at 995).  Maritime also challenges Graham Beck's assumption that the law of South Africa applies "based on an unsigned draft 2014 contract with a South African choice-of-law clause," arguing that Graham Beck has pointed to no authority that the unsigned contract is enforceable.  *Id*. at 21-22.  It also argues in a footnote that the forum selection clause in the 2018 Draft Agreement is not enforceable, noting that according to Maritime CEO Nickolopoulos, he never discussed the forum selection and choice of law provisions in these

12

draft contracts with anyone from Graham Beck.  *Id*. n. 16 (citing Declaration of Christopher

Nickolopoulos in Support of Opposition to Motion to Dismiss Complaint ("Nickolopoulos Decl.")

¶ 55).  Even if South African law applied, Maritime asserts, "this 'is not sufficient to warrant

dismissal when balancing of all relevant factors shows that plaintiff's chosen forum is

appropriate.'"  *Id*. at 22 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 260 n. 29 (1981);

*Rivendell Forest Products, Ltd. v. Canadian Pacific Ltd.*, 2 F.3d 990, 994 (10th Cir. 1993)

(finding it was an abuse of discretion to dismiss based only on choice-of-law)).

    According to Maritime, two additional factors that undermine  Graham Beck's position as

to  *forum non conveniens* are: 1) the Graham Beck loan and Nickolopoulos Guaranty, both of

which are governed by California law, which came due in June 2020 and upon which Graham

Beck is likely to sue in California (because South Africa likely cannot assert personal jurisdiction

over Nickolopoulos); and 2)  the fact that "Maritime will likely amend its complaint to assert a

conspiracy claim against the Beck Family Estates, which, after conspiring with Graham Beck to

terminate Maritime, began distributing its wine through California."  *Id*. at 23.  Maritime notes

that "Nickolopoulos may assert any defense available to Maritime (such as offset against the

damages Graham Beck caused Maritime)."  *Id*. (citing Cal. Civ. Code §2809).  Further, it is

"unclear whether the Beck Family Estates would be subject to jurisdiction in South Africa in a

claim brought by Maritime."  *Id*. Thus, Maritime asserts, if its claims in this case may be litigated

in South Africa while these other cases can only be litigated here, there will be the possibility of

inconsistent outcomes and waste of judicial resources.  *Id*.

    Maritime also rejects Graham Beck's challenges to its claims under Rule 12(b)(6).  *Id*. at

23-25.  With respect to its claim for breach of implied contract, Maritime rejects Graham Beck's

reliance on the 2014 Draft Agreement, arguing that it relies on that agreement only as *evidence* of

the existence of an implied agreement that the parties' relationship could only be terminated for

cause.  *Id*. at 24.  Because there is no enforceable written agreement, Maritime contends, the cases

upon which Graham Beck relies do not preclude Maritime from asserting a claim for breach of an

implied agreement.  *Id*.  Furthermore, it asserts, the implied-in-fact agreement alleged by Maritime

does *not* conflict with the terms of the 2014 Draft Agreement, in contrast to the authority cited by

13

United States District Court
Northern District of California

Graham Beck.  *Id*.

Like Graham Beck, Maritime offers declarations in support of its Opposition.  First, it has supplied a detailed declaration by Maritime's CEO, Christopher Nickolopoulos, in which he describes the history of Maritime's creation and its ongoing business relationship with Graham Beck, among other things.  Second, it has provided a declaration by its attorney, Stephen Flynn, with documents produced by Graham Beck in this action reflecting its marketing activities in the United States.  Flynn also provides a copy of Graham Beck's responses to Maritime's special interrogatories related to Graham Beck's contacts with the State of California in which Graham Beck refused to answer any of Maritime's interrogatories.

According to Nickolopoulos, after Graham Beck hired him, in 2006, it played a significant role in the creation of Maritime and has always been deeply involved in Maritime's business operations.  *See generally*, Nickolopoulos Decl.  In particular, Nickolopous offers the following account of his hiring by Graham Beck and the creation of Maritime:

1. I am the founder and chief executive officer of Maritime Wine Trading Collective ("Maritime"). I have personal knowledge of the facts stated in this declaration, and, if called as a witness, I would and could testify competently to these facts.

2. I have resided and worked in San Francisco, California since September 2001.

3. In or about 2006, I was recruited by Dawn Woffard of Napa Valley's Benchmark Consulting Group on behalf of Graham Beck Enterprises ("Graham Beck") who asked me to be an employee of Graham Beck. At the time, I was working in San Francisco with Constellation Brands, the world's largest producer of fine wines by volume.

4. When I was approached by Graham Beck in 2006, Graham Beck was an obscure South African wine producer struggling, along with most South African producers, to gain a foothold in a US market which has historically been dominated by domestic wine and European (primarily French and Italian) imports.

5. During the same time period, Graham Beck wines were being imported by a company based in Lexington, Kentucky created and run by Antony Beck called "Robant."

6. As was explained to me during the hiring process, the Graham Beck organization was not particularly pleased with the brand's performance within the United States.

7. The Graham Beck organization stated that an ongoing concern was the location of Robant in Kentucky, an area which is not relevant in the broader United States Wine trade. In addition, the Graham Beck organization expressed concern that Robant lacked

14

management and staff with experience, contacts and expertise is the nuanced and complicated United States wine business.

8.   As a result, by the time I was approached by Graham Beck in 2006, Robant had failed to establish any meaningful national distribution for Graham Beck wines. In 2006, Graham Beck wines were being distributed in just eight states, including Kentucky, Vermont and West Virginia.

9.   I accepted Graham Beck's offer of employment and began working as Graham Beck's employee on or about November 1, 2006. My job title was "North American Business Director." I remained an employee of Graham Beck from 2006 through 2008, during which time I lived and worked exclusively in San Francisco.

10.  After two years as an employee of Graham Beck, and sensing a major change was needed, in or about June of 2008, I proposed that a new company be created which would act as Graham Beck's national importer and strategic marketing company within the United States. Following discussions, the Graham Beck organization agreed to the idea with certain parameters. For example:

   a.  Graham Beck Enterprises wanted the new company to [be] owned by an American, so as to give the impression of the new company being separate from Graham Beck. A "fringe" benefit of this arrangement, as it was explained to me by Graham Beck financial manager John Sutherland, was that it could reduce the Beck family's interaction and reporting with the IRS.
   b.  Although Graham Beck would not technically be an owner of the new company, it was always understood, and the parties['] course of dealing showed that, as a practical matter, control of the new company would largely be under Graham Beck's direction.
   c.  In agreeing to set up a new import and marketing company, it was critical that the new company be located in San Francisco. San Francisco is located in proximity to the Napa and Sonoma wine countries and is the headquarters of three of the four largest wine companies in the world.  New York was the only other potential location Graham Beck was open to.
   d.  In addition to the location in San Francisco, Graham Beck was very concerned about appearances. Given the failure of the Kentucky import company, Graham Beck wanted to convey a favorable impression of the Graham Beck brand, and location and office appearances played an important part of that. At the time, I was working from home and had no need for an office, but as a condition of the arrangement, I agreed to lease a new office in the San Francisco's Transamerica building. Graham Beck reimbursed Maritime for the lease payments on this office.
   e.  In addition to the location and new office space, Graham Beck also insisted that I bring on a new partner with a business background. I selected Elijah Pfister, who recently had completed an MBA at Stanford University, and Graham Beck approved. Pfister would become a co-founder of Maritime and its chief operations officer, a position he holds to this day. At all times relevant hereto, Pfister was a resident of the Bay Area and worked within the Bay Area.
   f.  In addition to bringing on a new partner with a business background, Graham Beck insisted that Maritime obtain legal counsel and an accounting firm, each of which was subject to the approval of Graham Beck.

g.  As a further condition of the new arrangement, Graham Beck insisted that Maritime agree to assume Robant's aging inventory and losses on its books. The aging inventory, which was then beyond its prime was valued at approximately $1,000,000. Maritime was able to sell about half the inventory. As to the rest, Graham Beck insisted it be placed on Maritime's books and in exchange, Maritime would issue a note to Graham Beck guaranteed by me.

11. After agreeing to create a new import company, articles of organization for [Halcyon] Syndicate Ltd., LLC, dba Maritime Wine Trading Collective were filed with the California Secretary of State on January 1, 2009.  Even the name of the company – "Maritime Wine Trading Collective" – was discussed with Graham Beck and subject to its approval. The actual operations did not commence until later that year after Pfister completed his MBA program and the parties worked out an understanding of their deal.

12. To help set up the new company, in early 2009, John Sutherland, the former CFO of Graham Beck, flew to Maritime's new San Francisco offices to help set up the venture. Sutherland stayed for approximately one week and during that time he helped create accounts, wrote the general ledger, built the books, created the billing system and set up bank accounts. For the first five years of its existence, Graham Beck had full access to Maritime's financials.

13. The creation of Maritime was the result of extensive negotiations between the parties. Initial discussions of the parties' new arrangement involved me and Pfister, on the one hand, and Graham Beck, Antony Beck, John Sutherland (Graham Beck's then CFO), Gary Baumgarten (Graham Beck's then CEO), and Etienne Heyns (Graham Beck's marketing director) on the other. During the 2008 and 2009 time period, in-person discussions took place in San Francisco, New York City, and South Africa.

14. The substance of the new venture was best captured by a memorandum of understanding I prepared following a January 26, 2009 meeting between Nickolopoulos, Sutherland and Heyns in New York City. . .

15. For a period of three years following Maritime's creation, Graham Beck paid for a portion of Maritime's salaries, its office expenses, operating costs, freight, licensing, and warehouse fees and costs.

16. John Sutherland, Gary Baumgarten and Etienne Heyns of Graham Beck acted as advisors to Maritime, and practically speaking, I reported directly to them.

Nickolopoulos Decl. ¶¶ 1-16.

Nickolopoulos goes on to describe the business relationship between Maritime and

Graham Beck between 2009 and 2019, when Graham Beck terminated the relationship:

17. From 2009 until June 2019, Maritime was the exclusive importer and marketing agency for Graham Beck wines throughout the United States.

18. During this time period, Maritime performing several roles, which are summarized

16

below.

    a.  The first role was that of importer. This involves handling purchases, sales, compliance and logistics. There are many companies which only handle the duties of an importer (a model known as "winery direct").

    b.  The second role was that of marketing agency for Graham Beck wines. This role goes over and above the limited duties of handling orders, compliance and logistics as is the case for a winery direct importer. As marketing agency, Maritime, in constant communication with Graham Beck, would develop and implement a strategic marketing strategy to expand Graham Beck's brand recognition and sales throughout the United States. This was the primary value Maritime provided to Graham Back.

    c.  The third role – in California at least – was that of distributor. As the importer, Maritime would create relationships with regional distributors (wholesalers) who in-turn sell the wine they purchase from Maritime to retail establishments, restaurants and bars. During the course of the 10- year relationship, Maritime created its own wholesale distribution operation in the State of California, so rather than contracting with a third-party, Maritime performed the role of wholesale distributor in California, selling Graham Beck's wine directly to retail establishments.

19. The logistics of the venture worked as follows. Maritime would place a purchase order and send the same via email to Graham Beck in South Africa. Graham Beck would then issue a corresponding invoice. Graham Beck would then deliver the goods FOB the port in South Africa (at which point the risk of loss passed to Maritime), and the goods were shipped to California (usually Oakland) and delivered to Maritime's warehouse in Sonoma. Maritime would then remit payment in US Dollars via wire transfer to Graham Beck's bank account. From Maritime's warehouse, the wine was distributed to regional distributors and wholesalers who would then sell the wine to retailers, restaurants and bars.

20. By 2012, Graham Beck's foothold in the United States market grew from a mere eight states to thirty states (including powerhouses California, Texas, New York, Florida and Illinois), plus Canada and the Bahamas. By the time Graham Beck Enterprises terminated the relationship in 2019, Graham Beck wines were distributed in 45 states. This was made possible by the targeted marketing strategy discussed below and by expanding the number and quality of regional distributors secured by Maritime.

21. At all times during the 10-year relationship, the parties were in regular communication by phone and email, generally at least once per week (sometimes more).

22. Maritime was required to provide all its financials to Graham Beck on a monthly basis for the first five years of its existence.

23. Any decision to add a new supplier was subject to Graham Beck's prior approval. It was always understood that under no circumstances could Maritime represent any other South

African winery. In multiple instances, Graham Beck refused to allow new producers or pushed back at the idea of adding new producers (even producers located outside South Africa).

24. Because Graham Beck spent capital establishing the company, paying rent, paying salaries, and creating accounts and logistics, Graham Beck believed that such producers were unfairly benefiting from the platform and financial support Graham Beck had provided. Graham Beck also wanted Maritime's primary focus to be Graham Beck wines.

*Id.* ¶¶ 17-24.

According to Nickolopoulos, in-person meetings between representatives of Maritime and Graham Beck were common, as is typical of the wine industry in general, which "is a travel intensive business which places a premium on face-to-face communication and tastings." *Id.* ¶ 25. Nickolopoulos describes Graham Beck's travel to the United States as follows:

26. During the course of the entire 10-year relationship, Graham Beck executives and employees would travel to Maritime's San Francisco offices approximately 2-4 times per year. The visiting Graham Beck officers and employees included Chris [d]u Toit (CEO), Kobie Lochner (export director), Pieter Ferreria (winemaker), Etienne Heyns (export director), Gary Baumgarten (former CEO), John Sutherland (former CFO) and Pierre De Clerk (winemaker). Sometimes multiple Graham Beck representatives traveled together, other times, they traveled separately. The timing of the trips varied. The winemakers would usually travel to California in the fall (after the harvest) and the timing of the executives' trips to California were usually tied with their international travel schedules.

27. During the in-person meetings, the parties would discuss marketing strategy, marketing budgets, brand growth, current, past and projected sales, and Graham Beck's overall strategy for the brand in the United States. During the course of the parties' relationship, meetings also took place at trade shows throughout the United States or in major cities, like Las Vegas or New York. Meetings also took place in South Africa, at least during the initial first few years of the venture.

*Id.* ¶¶ 26-27.

According to Nickolopoulos, "[b]etween 2009 and 2019, Maritime grew the Graham Beck brand within California and the United States from an unknown producer to a highly regarded producer of fine sparkling wines." *Id.* ¶ 29. He estimates that over the period of the parties' 10-year relationship, approximately 300,000 bottles of Graham Beck wine were distributed and sold within the State of California, translating to approximately $6,000,000 in sales within the State of California. *Id.* ¶ 32.

United States District Court
Northern District of California

E.    **Reply**

In its Reply, Graham Beck claims that Maritime's version of the facts is "rife with inaccuracies" and supplies a supplemental declaration by du Toit addressing these alleged inaccuracies.  Reply at 6.  Graham identifies the following statements by Nickolopoulos it contends are false:

- Contrary to Nickolopoulos's statement that Graham Beck was "an obscure South African wine producer struggling … to gain a foothold in [the U.S.] market which has historically been dominated by domestic wine and European (primarily French and Italian) imports, Nickolopoulos Decl., ¶ 4, "Graham Beck was neither obscure nor struggling in 2006."  Reply at 6 (citing Declaration of Chris du Toit in Support of Reply to Motion to Dismiss ("du Toit Reply Decl."), ¶ 4). Rather, Graham Beck contends it already had a "strong foothold in the American market."  *Id.*

- While Nickolopoulos stated that Graham Beck felt it was "critical" that the new company be located in San Francisco, Nickolopoulos Decl. ¶ 10(c), in fact, "Graham Beck never stated that it was 'critical' for a new company to be located in San Francisco."  Reply at 6.  Instead, Graham Beck contends, "New York or Chicago were acceptable locations to Graham Beck as well, but Graham Beck settled for San Francisco because Nickolopoulos's family already lived there."  *Id.* (citing du Toit Reply Decl., ¶ 5).

- Contrary to Nickolopoulos's statement that Graham Beck had Maritime lease office space in the Transamerica building for the sake of appearances due to the failure of its importer in Kentucky, Nickolopoulos Decl. ¶ 10(d), Graham Beck contends that the Kentucky importer was not a failure and denies any knowledge of Maritime ever leasing office space in the Transamerica building; to the extent Maritime leased additional office space in San Francisco it was simply because more space was needed and the office spaces that Maritime leased were at other addresses.  *Id.* at 7 (citing du Toit Reply Decl. ¶ 7).

Graham Beck does not dispute that its former CFO, John Sutherland, came to San

19

Francisco in 2009 to help Maritime set up its office there. *Id*. at 7 (citing Nickolopoulos Decl. ¶ 7). According to Graham Beck, this was because Nickolopoulos "was not able to create the documents and systems required for the formation of Maritime[.]" *Id*. at 7-8 (citing du Toit Reply Decl. ¶ 8). Likewise, it does not dispute that it was involved in the appointment by Maritime of "competent accounting professionals and legal counsel as well." *Id*. at 8 (citing du Toit Reply Decl. ¶ 8). Similarly, Graham Beck concedes that "[f]or a period of three (3) years following Maritime's creation, Graham Beck paid a portion of the following: (i) Maritime's salaries; (ii) Maritime's office expenses; (iii) Maritime's operating costs; (iv) Maritime's freight; (v) Maritime's licensing; (vi) Maritime's warehouse fees and costs." *Id*. (citing Nickolopoulos Decl., ¶ 15). Graham Beck notes, however, that its Global Market Sales Director since 2006, Etienne Heyns, has never had access to Maritime's annual financial statements and du Toit has not had access to Maritime's annual financial statements since 2012. *Id*. (citing du Toit Reply Decl. ¶ 8).

In its Reply, Graham Beck reiterates the arguments it made in the Motion with respect to personal jurisdiction, venue and *forum non conveniens*. On the question of specific jurisdiction, Graham Beck places great emphasis on the choice of law provision in the 2014 Draft Agreement and the forum selection clause in the 2018 Draft Agreement, arguing that these are evidence of the parties' agreement that disputes would be litigated in South Africa under South African law.[6] *Id*. at 12-14.

Graham Beck also argues that the cases upon which Maritime relied to show specific jurisdiction are not on point. *Id*. at 15. With respect to *Taubler*, Graham Beck argues that the facts are distinguishable because in that case the "non-resident defendant 'deliberately targeted' the forum state's wine market with a barrage of sales visits, sample shipments, and written and electronic communications, ultimately concluding a contract in the forum state and paying duties on merchandise exported thereto." *Id*. (citing 655 F.2d at 991). According to Graham Beck, the facts here are different because "here there is no evidence that Graham Beck engaged in any

---

[6] As discussed further below, the significance of these two provisions is most appropriately addressed in the context of Graham Beck's request for dismissal under the doctrine of *forum non conveniens* and therefore the Court addresses these arguments in that section of its analysis rather than in its discussion of personal jurisdiction.

1    systematic attempt to tap the California market. Graham Beck engaged in no such aggressive

2    marketing activities whatsoever.  Maritime ordered wine, and Graham Beck had the crates loaded

3    on a cargo ship F.O.B." *Id.* at 15-16.

4         Graham Beck argues that Maritime's reliance on *Santa Margherita, S.p.A. v. Weine*, No.

5    CV 12–03499 DSF (RZ), 2013 WL 12125539, at *6 (C.D. Cal. Aug. 28, 2013) is misplaced,

6    because the judge in that case called it a "close case."  *Id.* at 15.   According to Graham Beck,

7    other cases with similar facts reached the opposite result.  *Id.* (citing *Cybiotronics, Ltd. v. Golden*

8    *Source Elecs., Ltd.*, 130 F. Supp. 2d 1152. 1172 (C.D. Cal. 2001) and *Decker Coal Co. v.*

9    *Commonwealth Edison Co.*, 805 F.2d 834, 841 (9th Cir. 1986)).

10        Graham Beck does not address Maritime's argument that venue is proper under 28 U.S.C.

11   § 1391(b)(3) despite the fact that there is an available forum in South Africa because that section

12   provides a catch-all for venue where no other forum in a federal district court *in the United States*

13   is available.  Nor does it address the cases Maritime cites in support of its contention that

14   California has an interest in protecting its citizens.  Graham Beck also does not address Maritime's

15   arguments with respect to its Rule 12(b)(6) challenges.

16

17        **F.    Objection to du Toit Reply Declaration, Submission of Heyn Declaration in**
           **Response to Objection and Objection to Heyn Declaration**

18        Following Graham Beck's submission of the du Toit Reply Declaration, Maritime filed an

19   objection to that declaration based on lack of personal knowledge as to virtually all of the

20   statements in du Toit's declaration.  *See* Docket No. 35 (objecting to Paragraphs 5-10 and 12-14 of

21   the du Toit Reply Decl.).  According to Maritime, du Toit was not employed by Graham Beck

22   until 2012 and was not involved in many of the events described in the declaration, including the

23   hiring of Nickolopoulos and the creation of Maritime.  *Id*.  On July 7, 2020, Graham Beck

24   submitted a declaration by Etienne Heyns, who was the Global Sales and Marketing Manager for

25   Graham Beck starting in 2005 and the Global Sales manager until 2017.  Docket No. 37.   Heyns

26   states that he has reviewed du Toit's Reply declaration and "confirms" its contents.  *Id*.  On July

27   10, 2020, Maritime filed another objection arguing that the Heyns Declaration is untimely and

28   asking the Court to strike it.

United States District Court
Northern District of California

Maritime is correct that Graham Beck was required to (but did not) seek leave of the Court to file the Heyn Declaration given that briefing had already been completed.  Moreover, it is doubtful the statements in the du Toit Reply declaration are admissible – even if they are considered in combination with the Heyns declaration "confirming" them.   Nonetheless, the Court need not reach this question because the statements in the du Toit Reply Declaration do not change the Court's conclusions with respect to any of the issues raised in the Motion. Therefore, the Court declines to rule on Maritime's request to strike the Heyn Declaration or its objections to the du Toit Reply Declaration.

**III.    ANALYSIS**

**A.    Whether There is Personal Jurisdiction Over Defendant Graham Beck**

**1.  Legal Standards**

a.   Rule 12(b)(2)

A party may move for dismissal under Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction.  "When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant."  *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).  "Where, as here, the motion is based on written materials rather than an evidentiary hearing, 'the plaintiff need only make a prima facie showing of jurisdictional facts.'"  *Id.* (quoting *Sher v. Johnson*, 911 F.3d 1357, 1361 (9th Cir.1990)).  "Although the plaintiff 'cannot simply rest on the bare allegations of its complaint,' … uncontroverted allegations in the complaint must be taken as true."  *Schwarzenegger v. Fred Motor Corp.*, 374 F.3d 797, 800 (9th Cir. 1998) (quoting *Amba Marketing Systems, Inc. v. Jobar International, Inc*., 551 F.2d 784, 787 (9th Cir.1977)).  "Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor."  *Id.* (citing *AT & T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996)).

b.   Standards Governing Exercise of Personal Jurisdiction

"Where . . . there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits."  *Dole Food Company,*

22

*Inc. v. Watts*, 303 F.3d 1104, 1110 (9th Cir. 2002). "Under California's long-arm statute, California state courts may exercise personal jurisdiction 'on any basis not inconsistent with the Constitution of this state or of the United States.'" *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (quoting Cal. Civ. Proc. Code § 410.10). Thus, the Court must determine whether the exercise of personal jurisdiction over Graham Beck "comports with the limits imposed by federal due process." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 464 (1985)).

"For a court to exercise personal jurisdiction over a non-resident defendant, that defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Dole Food Company*, 303 F.3d at 1110–11 (*citing International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Calder v. Jones*, 465 U.S. 783, 788 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).

"Opinions in the wake of the pathmarking *International Shoe* decision have differentiated between general or all-purpose jurisdiction, and specific or case-linked jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, nn. 8, 9 (1984)). General jurisdiction may be established when a defendant's contacts with a state are "substantial" or "continuous and systematic" such that the defendant "can be haled into court in that state in any action, even if the action is unrelated to those contacts." *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. at 924. It is undisputed that that standard is not met here.

A court may exercise specific jurisdiction when the following requirements are met:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Dole Food*, 303 F.3d at 1111 (internal quotations and citations omitted). "The plaintiff bears the burden of satisfying the first two prongs of the test." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (*citing Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)). "If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." *Id.* If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to present a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (*quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)).

To determine whether the exercise of jurisdiction is reasonable, and therefore, "comports with fair play and substantial justice," courts consider seven factors:

> (1) the extent of the defendants' purposeful injection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Insurance Co. of North America v. Marina Salina Cruz*, 649 F.2d 1266, 1270 (9th Cir. 1981).

### 2. Application of Legal Standards

The crux of the parties' dispute with respect to personal jurisdiction is whether Maritime has demonstrated that Graham Beck's conduct satisfies the purposeful availment requirement of the specific jurisdiction analysis. The Court finds that it has.

In *Taubler v. Giraud*, 655 F.2d 991, 992 (9th Cir. 1981), the Ninth Circuit addressed whether there was purposeful availment where the facts were somewhat similar to the facts here. In that case, a salesperson (Taubler) for a California wine distributor (Bass-Charrington) met Philippe Giraud, a French citizens who along with his father Robert Giraud owned a winery in France, while Philippe was in California promoting his wine. 655 F.2d at 992. Together, they visited a number of California wine retailers and distributors; and the following year Taubler met both Philippe and Robert at a French wine promotional event in New York and then traveled with

them to California.  *Id*.  Taubler and the Girauds "developed a personal and working relationship" and ultimately Taubler quit his job as a wine salesperson and entered into negotiations with the Girauds to distribute their wine.  *Id*.  During the negotiations, the parties engaged in "extensive communications via telephone, telex, telegram and mail." *Id.*  Taubler flew to France once to engage in negotiations.  *Id.*

Eventually, the parties reached an agreement that gave Taubler the exclusive right to distribute the Girbauds' wines in California for a two-year period.  *Id*. The initial agreement did not include prices or certain other details, but the parties later met in New York to work those out.  *Id.*  The Girauds paid Taubler's travel expenses from California to New York because the meeting had originally been planned to occur in California.  *Id*.  Taubler filed fair trade forms in California that were signed by Robert Giraud.  *Id*.  The court found that the Giraud's "knew that this would allow them to benefit from the California laws regarding price posting and minimum prices."  *Id*.

While the contract was in effect, the Girauds shipped one order of wines to Taubler at San Francisco, FOB France, with payment due 60 days after arrival.  *Id*.  Delivery in California was a prerequisite to payment and the payment was made from California.  *Id*.  The Girauds also sent sample cases and labels to California, and paid customs penalties incurred in California.  *Id*. In addition, "unknown to Taubler, the Girauds contracted with Somerset Wine Company, Inc., a national wine distributor" and encouraged that wine distributor to sell its wines to Taubler's California customers at lower prices.  *Id*.  The Girauds then refused to sell their wines to Taubler, who sued in California federal court for breach of contract and antitrust violations.  *Id*.  at 993.

The district court dismissed the action based on lack of personal jurisdiction over the Girauds but the Ninth Circuit reversed, holding that the Girauds intentionally targeted the California market, that the action arose out of the Girauds' contacts with California, and that the exercise of personal jurisdiction was reasonable.  *Id*. at 993. In reaching the conclusion that the Giraud's deliberately targeted California, the Court noted that while many of their contacts "would be insignificant if viewed alone," when "viewed in their totality" they showed that "they knew and intended that their wines would be sold [in California], they actively promoted their product in California, and they were willing to breach the contract and violate antitrust laws in order to

United States District Court  
Northern District of California

increase their business success there." *Id*. at 994.  In finding that the exercise of jurisdiction was reasonable (and rejecting the Girauds' argument that it was not reasonable to subject them to jurisdiction in California where they had only sent to California a single shipment of wine FOB France and had no office or agent of service of process in California), the Court concluded that "the  communications combined with the fact that California was the intended destination of the wine lend credence to Taubler's theory that the Girauds were serious businessmen who fully intended to enter the California market and  avail themselves of the benefits of doing business there." *Id*. at 995-996.

The totality of the circumstances here lends even stronger support for the conclusion that Graham Beck deliberately targeted California than do the facts in *Taubler*.  In particular, Graham Beck does not dispute that it reached out to a California recruiting company to find someone to help it distribute its wines in the United States, hired a resident of San Francisco (one of only a handful of locations in the United States that would have been acceptable to Graham Beck) to carry out this task, engaged in extensive efforts that included numerous trips to California to set up a new company (Maritime) to distribute its wines in the United States, engaged in extensive involvement and oversight of Maritime's business throughout the ten-year business relationship, sold hundreds of thousands of bottles of wine to California for which it accepted payment in U.S. dollars, and continued to reach out to California wine sellers to sell its wines to them directly after terminating its relationship with Maritime.  Moreover, Maritime's claims arose from Graham Beck's contacts with the forum state, namely its ongoing business relationship with Maritime in California.

While Graham Beck attempts to distinguish *Taubler* on the facts by arguing that in that case there was "a barrage of sales visits, sample shipments, and written and electronic communications" to California, its argument is not persuasive.  Contrary to Graham Beck's assertion, the Court finds that the Girauds' contacts were significantly *less* substantial than the contacts with California in this case.  Indeed, the Ninth Circuit acknowledged that the Girauds' contacts with California were "not substantial" and that the "list of things they did not do in California is long: they had no California office; they did not visit there during the duration of the

contract; they did not own property there or hire California employees." *Id*. at 996.  Therefore, the Ninth Circuit's conclusions in *Taubler* with respect to purposeful availment also apply here.

The Court's finding of personal jurisdiction in *Santa Margherita, S.p.A. v. Weine*, No. CV 12-03499 DSF (RZ), 2013 WL 12125539 (C.D. Cal. Aug. 28, 2013) also supports the conclusion that there is personal jurisdiction here.  In that case, an Italian wine maker (Santa Margherita) brought an action in a California federal court against a German distribution company (Unger Weine) that was selling the wine to an importer in Pasadena, California (Thomas Wine) even though Santa Margherita had an exclusive distribution agreement with another wine importer. 2013 WL 12125539, at *1.  Santa Margherita brought claims for unauthorized "grey market" export of its wines against the German distributor.  In finding that Unger Weine had deliberately availed itself of the privileges of doing business in California, the court pointed to Unger Weine's "standing order for the purchase of Santa Margherita wine," that it "invoiced Thomas Wine at its Pasadena address, and prepared the wine for shipping to California, including by putting on the shipping labels with Thomas Wine's Pasadena address," and that it had an "ongoing relationship" with the California wine importer, even though it did not directly ship the wine to California.  *Id*. at *4.  The court went on to find that the exercise of jurisdiction over Unger Weine was reasonable because "Unger Weine knowingly entered into a business transaction with a California-based corporation" and one of its representatives travelled to California "several times a year." *Id*. The facts of this case reflect much more substantial contacts between Graham Beck and Maritime than existed in *Santa Margherita* and therefore the conclusions the court reached in that case apply with even more force here.[7]

Finally, the Court rejects Graham Beck's reliance on *Cybiotronics, Ltd. v. Golden Source*

_____

[7] In its Reply brief, Graham Beck argues that the Court should not rely on the decision in *Santa Margherita* with respect to the question of specific jurisdiction because the court in that case observed that it was a "close case."  Reply at 15 (citing 2013 WL 12125539, at *6).  While Graham Beck implies that court made that observation in connection with its personal jurisdiction analysis, in fact it did not.  Rather, the observation related to whether the plaintiff in that case had stated a claim under Rule 12(b)(6). *See* 2013 WL 12125539, at *6 ("This is a close case, but under the still relatively lenient 12(b)(6) standard, the Court finds that the Complaint sufficiently pleads material differences in packaging and quality control measures between the wine Santa Margherita authorizes for U.S. distribution and the wine sold by Unger Weine to Thomas Wine."). Therefore, the court's comment has no bearing on the analysis here.

*Elecs. Ltd.*, 130 F. Supp. 2d 1152 (C.D. Cal. 2001) in support of its assertion that there is no specific jurisdiction in California.  In that case, which involved claims of patent infringement by a defendant based in Hong Kong, there was no dispute as to whether the court had personal jurisdiction.  Rather the court addressed whether the defendant had conducted infringing activities in the United States for the purposes of establishing liability.  Even assuming the analysis in that case has any bearing on the issue here, the facts were distinguishable because the court in that case found that the sale of the goods at issue "was (primarily) negotiated in Hong Kong, executed in Hong Kong, and was performed in Hong Kong."  130 F. Supp. 2d at 1173.

Accordingly, the Court finds that there is specific jurisdiction in California over Graham Beck.[8]

### B.    Whether Venue is Proper

A party may bring a motion to dismiss an action for improper venue pursuant to Rule 12(b)(3). On a motion to dismiss pursuant to Rule 12(b)(3), "the pleadings need not be accepted as true, and the court may consider facts outside of the pleadings."  *Murphy v. Schneider National, Inc.*, 362 F.3d 1133, 1137 (9th Cir. 2004) (citations omitted).   In evaluating the facts, "the trial court must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party." *Id*. at 1138.  Where there are genuine factual disputes, the district court has the discretion to hold a Rule 12(b)(3) motion in abeyance until it holds an evidentiary hearing on the disputed facts. *Id*. at 1139.

Under 28 U.S.C. § 1391(b), "a civil action may be brought in:   1) a judicial district in

---

[8] The Court notes that Graham Beck did not assert in either its Motion or its Reply brief that assertion of jurisdiction in California is unreasonable, even though Maritime raised this issue in its Opposition brief.  Therefore, the Court finds that it is undisputed that the exercise of personal jurisdiction is reasonable.  In any event, the Court concludes that the exercise of personal jurisdiction over Graham Beck is, in fact, reasonable for many of the same reasons the Ninth Circuit found in *Taubler* that the exercise of personal jurisdiction was reasonable.  Here, as in *Taubler*, the defendant engaged in efforts to promote its wines in California, knew its wines would be sold there and benefitted from its consistent and lucrative business in California. *See* 655 F.2d at 993; *see also Data Disc, Inc. v. Sys. Tech. Assocs., Inc*., 557 F.2d 1280, 1287–88 (9th Cir. 1977) (holding that there was specific jurisdiction where the defendant participated in contract negotiations in California, and where the activities of the defendant's employees in California were beneficial to the defendant, and further finding that it was not unreasonable for California to exercise jurisdiction because  "California has an interest in providing a forum for companies doing business there and the actions of [the defendant] did have an impact in California.").

which any defendant resides, if all defendants are residents of the State in which the district is located; 2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or 3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."   The plaintiff bears the burden of showing that venue is proper.  *See Piedmont Label Co. v. Sun Garden Packing Co.,* 598 F.2d 491, 496 (9th Cir. 1979) ("Plaintiff had the burden of showing that venue was properly laid in the Northern District of California."). When venue is improper, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

Here, Maritime claims that venue is proper under subsections (b)(2) and (b)(3).  The Court finds that venue is proper under subsection (b)(2) because a substantial part of the events that gave rise to its claims occurred in this district.  In the alternative, even if subsection (b)(2) does not apply, it is clear that venue is proper under subsection (b)(3) because there is jurisdiction for the reasons discussed above and there is no other judicial district where this action can be brought.  To the extent Graham Beck suggests this provision does not apply because the case can be brought in South Africa, there is no legal authority to support its position.   Section 1391(b)(3) requires that there must be no "district" where the action may otherwise be brought.  The only reasonable interpretation of the word "district" is that it refers to district courts within the federal judicial system of the United States.  That interpretation is consistent with the Supreme Court's discussion of the venue statute in *Atlantic Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas,* in which the Court held that "venue is proper so long as the requirements of § 1391(b) are met, irrespective of any forum-selection clause."  571 U.S. 49, 57 (2013).  In that case, the Court reasoned that a reading § 1391(b) that would mean that in some cases "venue would not lie in any federal district" "would not comport with the statute's design, which contemplates that venue will always exist in some federal court."[9]  *Id.*

---

[9] For this reason, Graham Beck's argument that the forum selection clause in the 2018 Draft Agreement should be enforced has no bearing on whether venue in this district is proper.

Therefore, the Court rejects Graham Beck's assertion that venue in this District is not proper.

**C.      Whether the Action Should Be Dismissed Under the *Forum Non Conveniens* Doctrine**

**1.   Legal Standards**

A motion to dismiss based on *forum non conveniens* is governed by federal common law and not by Rule 12(b)(3), which only applies to motions to dismiss based on "improper venue." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 60 (2013). Nonetheless, the standards that govern evaluation of the facts under Rule 12(b)(3) also govern the evaluation of facts relevant to determining whether dismissal is appropriate under the doctrine of *forum non conveniens.  See id.* at 61 ("because both § 1404(a) and the *forum non conveniens* doctrine from which it derives entail the same balancing-of-interests standard, courts should evaluate a forum-selection clause pointing to a nonfederal forum in the same way that they evaluate a forum-selection clause pointing to a federal forum");  5B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 1352 (3d ed. 2013) ("Technically speaking, motions to transfer [under § 1404(a)] are made pursuant to a motion under the statute rather than under Rule 12(b)(3), although little, other than the possible application of the consolidation requirement in Rule 12(g), turns on this distinction.").  Thus, when considering whether dismissal is appropriate under the doctrine of *forum non conveniens* the Court may look beyond the facts alleged in the complaint but must draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party.

"A district court has discretion to decline to exercise jurisdiction in a case where litigation in a foreign forum would be more convenient for the parties. *Lueck v. Sundstrand Corp*., 236 F.3d 1137, 1142 (9th Cir.  2001) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504 (1947) ("*Gilbert*"));  *see also In re Montage Tech. Grp. Ltd. Sec. Litig.,* 78 F. Supp. 3d 1215, 1221 (N.D. Cal. 2015) ("*Forum non conveniens* is a common law doctrine allowing a court to decline to exercise its jurisdiction in cases where litigation in the forum would place an undue burden upon one of the parties." ).  It is "an exceptional tool to be used sparingly." *Ravelo Monegro v. Rosa*,

<div style="writing-mode: vertical">United States District Court
Northern District of California</div>

United States District Court
Northern District of California

211 F.3d 509, 514 (9th Cir. 2000); *see also Carijano v. Occidental Petroleum Corp*., 643 F.3d

1216, 1224 (9th Cir. 2011) ("The doctrine of *forum non conveniens* is a drastic exercise of the

court's 'inherent power' because, unlike a mere transfer of venue, it results in the dismissal of a

plaintiff's case.").

"A party moving to dismiss based on *forum non conveniens* bears the burden of showing

(1) that there is an adequate alternative forum, and (2) that the balance of private and public

interest factors favors dismissal." *Dole Food,* 303 F.3d at 1104. "This showing must overcome

the 'great deference . . . due plaintiffs because a showing of convenience by a party who has sued

in his home forum will usually outweigh the inconvenience the defendant may have shown.'"

*Lockman Found. v. Evangelical All. Mission*, 930 F.2d 764, 767 (9th Cir. 1991) (quoting *Contact

Lumber Co. v. P.T. Moges Shipping Co*., 918 F.2d 1446, 1449 (9th Cir. 1990) (citing *Gates

Learjet Corp. v. Jensen*, 743 F.2d 1325, 1335 (9th Cir.1984), *cert. denied*, 471 U.S. 1066 (1985))).

Thus, dismissal is proper under the doctrine of *forum non conveniens* only when, in light of the

private and public interest factors, defendants have made a "clear showing" that "establish[es]

such oppression and vexation of a defendant as to be out of proportion to the plaintiff's

convenience, which may be shown to be slight or nonexistent[.]" *Miskow v. Boeing Co*., 664 F.2d

205, 208 (9th Cir. 1981) (internal quotation and citation omitted).[10]

---

[10] These standards are subject to certain modifications where there is an enforceable forum-selection agreement between the parties.   As the Supreme Court explained in *Atlantic Marine Construction Co.*, "[t]he calculus changes . . . when the parties' contract contains a valid forum-selection clause, which 'represents the parties' agreement as to the most proper forum.'"  571 U.S. at 63 (quoting *Stewart Org., Inc. v. Ricoh Corp*., 487 U.S. 22, 31 (1988)).  Under those circumstances, the district court should adjust its analysis by: 1) giving "no weight" to the plaintiff's choice of forum; 2)  "deem[ing] the private-interest factors to weigh entirely in favor of the preselected forum;"  and 3) disregarding the original venue's choice-of-law rules. *Id.* at 63-64.  While the Supreme Court in that case was discussing transfer under 28 U.S.C. § 1404(a) rather than the common law doctrine of *forum non conveniens*, the Court finds that the same rules apply in the latter scenario based on the Court's observation that courts should evaluate the significance of forum-selection clauses with respect to *forum non conviens* under the same standards that are applied to transfers under 28 U.S.C. § 1404(a).  *Id.* at 61 ("And because both § 1404(a) and the *forum non conveniens* doctrine from which it derives entail the same balancing-of-interests standard, courts should evaluate a forum-selection clause pointing to a nonfederal forum in the same way that they evaluate a forum-selection clause pointing to a federal forum.").   Here, however, the only forum selection clause cited by Graham Beck is contained in the 2018 Draft Agreement, which was sent to Maritime by Graham Beck but was never signed by Maritime.  In contrast to the 2014 Draft Agreement, which Maritime has alleged is the "best evidence" of the parties' agreement, there is no evidence in the record that Maritime ever agreed to the terms of the

**2.** **Application of Legal Standards**

It is undisputed that there is an adequate alternative forum in South Africa as Graham Beck

has conceded that it is amenable to service of process there and Maritime has not challenged the

adequacy of that forum. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 n. 22 (1981)

(observing that the adequate alternative forum requirement "[o]rdinarily . . . will be satisfied when

the defendant is 'amenable to process' in the other jurisdiction") (quoting *Gilbert*, 330 U.S. at

506-507); du Toit Reply Decl. ¶ 11 (stating that Graham Beck is amenable to process in South

Africa); Opposition at 21 ("assuming" that South Africa is an adequate forum).  Thus, the Court

must balance the private and public interests of exercising jurisdiction to determine whether

Graham Beck has made a "clear showing" that dismissal under the *forum non conveniens* doctrine

is warranted under the standards discussed above or that other factors related to the administration

of this Court warrant transfer.  The Court concludes that it has not.

     a.   Private Interest Factors

"The factors relating to the private interests of the litigants include: '(1) the residence of

the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical

evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify;

(5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) all other

practical problems that make trial of a case easy, expeditious and inexpensive.'"  *Carijano*, 643

F.3d at 1229 (quoting *Boston Telecomms. Grp. v. Wood*, 588 F.3d 1201, 1206–07 (9th Cir. 2009)

(internal quotations and citations omitted)).

With respect to the first and third factors (location of witnesses and physical evidence), the

Ninth Circuit has cautioned that "a court's focus should not rest on the number of witnesses or

quantity of evidence in each locale" but "[r]ather, a court should evaluate 'the materiality and

_____

2018 Draft Contract, including its forum selection provision.  While Graham Beck points to
discovery responses in which Maritime conceded that had never responded or objected to the
forum selection provision, this alone is not sufficient to give rise to an enforceable contract where
Maritime also never signed the agreement; moreover, Nickolopoulos states in his declaration that
he never discussed the forum selection clause with anyone at Graham Beck.  Therefore the Court
finds that there is insufficient evidence on this record for the court to modify the usual standards
governing *forum non conveniens* motions.

United States District Court
Northern District of California

United States District Court
Northern District of California

importance of the anticipated [evidence and] witnesses' testimony and then determine[ ] their accessibility and convenience to the forum.'" *Lueck*, 236 F.3d at 1146 (quoting *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1335–36 (9th Cir.1984)).  Here, Graham Beck has presented a tally of witnesses but Maritime contends a number of key witnesses are based in San Francisco. Graham Beck also claims much of the physical evidence is in South Africa but has not pointed to any specific evidence in support of that claim.  Nor does it dispute that many of the key documents in the case are in electronic format and can be accessed just as easily from one forum as the other. Therefore the Court finds that Graham Beck has not made a clear showing that these considerations point in favor of dismissal.

Graham Beck also has not addressed whether unwilling witnesses can be compelled to testify in either forum.  While this may be an issue wherever Maritime's claims are tried, it is Graham Beck's burden to show that this factor favors dismissal and it has not done so.

Graham Beck also has failed to make a clear showing that litigating in the Northern District of California is so inconvenient as to be vexatious or oppressive.  The uncontroverted evidence shows that Graham Beck has extensive contacts with the forum that span over a decade, with regular travel to the United States over that period by Graham Beck representatives to oversee Maritime's business and promote its wines.  There is nothing in the record to suggest that litigating in this forum will be so inconvenient as to warrant transfer to South Africa.  The Court also notes that the evidence presented by both sides is consistent in reflecting that the travel by Graham Beck to California vastly exceeded any travel by representatives of Maritime to South Africa.

Further, while the Court recognizes that litigation of this case and the case that Graham Beck filed in South Africa may result in significant inconvenience and inefficiency, the Court is not persuaded that dismissal under *forum non conveniens* is the answer to those concerns.  Graham Beck filed the action in South Africa several months after Maritime filed this action and it may be that Maritime will bring objections in the South African court that mirror those of Graham Beck when it is able to do so.  Dismissal of this action under *forum non conveniens* would, arguably, encourage forum shopping and will simply shift the burden from Graham Beck to Maritime.

Therefore, the Court finds that private interest factors do not support dismissal under the doctrine of *forum non conveniens* and the existence of the parallel action in South Africa does not change the Court's conclusion.

b.   Public Interest Factors

The public interest factors courts consider are : "(1) the local interest in the lawsuit, (2) the court's familiarity with the governing law, (3) the burden on local courts and juries, (4) congestion in the court, and (5) the costs of resolving a dispute unrelated to a particular forum." *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1181 (9th Cir. 2006) (citing *Lueck*, 236 F.3d at 1147).

Graham Beck has strenuously argued that there is no local interest in this lawsuit, ignoring the well-established rule that "[a] State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985).  That rule is particularly salient here, where Graham Beck essentially created the California company that alleges that it has been wronged, intentionally injecting itself into the State of California over the course of a decade to profit from sales of its wines through Maritime's efforts.  The Court finds that this consideration strongly favors exercising jurisdiction over Maritime's claims.

The Court also finds that Graham Beck has not made a clear showing that the burden on this Court of adjudicating Maritime's claims will be any greater than they would be if Maritime were to litigate its claims in South Africa.  While Graham Beck points to the delays associated with the Covid-19 emergency in this Court, especially with respect to holding jury trials, it has offered no evidence suggesting that the courts in South Africa are not experiencing the same challenges and associated delays.

The only public interest factor that might point in Graham Beck's favor relates to the choice of law that will be applied to Maritime's claims.   Maritime does not dispute that the 2014 Draft Agreement specified that South African law would be applied to claims arising out of that agreement.  Moreover, it is alleged in the Complaint that the 2014 Draft Agreement was "the best evidence of the parties' implied agreement" and that the parties simply never got around to signing it.  Complaint ¶¶ 27, 33.   These allegations and the facts they reflect could constitute evidence, by

United States District Court
Northern District of California

judicial admission or otherwise, that the parties agreed to apply the law of South Africa to disputes arising from their business relationship.  *See  Vita Planning & Landscape Architecture, Inc. v. HKS Architects, Inc.*, 240 Cal. App. 4th 763, 771 (2015) (holding that the trial court had not erred in enforcing a forum selection clause in an unsigned contract based on a factual finding that by attaching the contract to its complaint the plaintiff had made a judicial admission there was a contract as to the forum in which disputes would be adjudicated).  The Court need not decide this question, however, because it concludes that even if it is required to apply South African law, that consideration by itself does not warrant dismissal under the doctrine of *forum non conveniens.*[11]

First, it is well-established that it is an abuse of discretion to dismiss under the doctrine of *forum non conveniens* based solely on the fact that the court will be required to apply the law of another forum.  *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 260 (1981) (noting that the need to apply foreign law "alone is not sufficient to warrant dismissal when a balancing of all relevant factors shows that the plaintiff's chosen forum is appropriate. ").  Second, Graham Beck has not identified any differences in South African contract law with respect to the law that governs the claims Maritime asserts in this case.  Indeed, it relies on California contract law to challenge the sufficiency of the pleadings despite arguing that South African law applies to those claims, apparently assuming that the law is essentially the same.  Given that Graham Beck has not demonstrated that the other public interest considerations favor its position – and that California has a strong interest in protecting Maritime's interest – the Court finds that the public interest factors also do not support dismissal.

c.  Conclusion

Balancing the private and public interest factors discussed above, and taking into

---

[11] The Ninth Circuit has held that where there the choice of law may implicate special venue statutes that would require that the action be heard in federal district court, courts must make the choice of law determination before addressing *forum non conveniens*.  *See Lueck*, 236 F.3d 1137, 1148 (9th Cir. 2001) (citing *Zipfel v. Halliburton Co.*, 832 F.2d 1477, 1482 (9th Cir.1987), amended on other grounds by 861 F.2d 565 (9th Cir.1988)).  On the other hand, where the case does not implicate any United States law which mandates venue in the United States district court, courts may address *forum non conveniens* without first making a dispositive choice of law determination.  *Id*.  As the choice of law question here does not implicate any statute with special venue provisions mandating that the case be heard in federal district court, the Court is not required to make a definitive choice of law determination at this stage of the case.

consideration the deference to which Maritime's choice of forum is entitled, the Court concludes

that dismissal of this case under the doctrine of *forum non conveniens* is not warranted.

### D.   Whether Maritime States a Claim

#### 1.   Legal Standard Under Rule 12(b)(6)

A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure

for failure to state a claim on which relief can be granted.  "The purpose of a motion to dismiss

under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp.*

*Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a plaintiff's burden at the pleading stage

is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which

sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing

that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and

takes "all allegations of material fact as true and construe[s] them in the light most favorable to the

non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that

would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

1990).  A complaint must "contain either direct or inferential allegations respecting all the material

elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101,

1106 (7th Cir. 1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation

of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Twombly*, 550 U.S. at 555).  "[C]ourts 'are not bound to accept as true a legal conclusion

couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S.

265, 286 (1986)).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of

'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557)

(alteration in original).  Rather, the claim must be "'plausible on its face,'" meaning that the

plaintiff must plead sufficient factual allegations to "allow[] the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S.

at 570).

### 2. Whether Maritime States a Claim for Breach of Implied-in-Fact Contract[12]

Under California law, a contract may be either express or implied. *Retired Employees Assn. of Orange Cty., Inc. v. Cty. of Orange*, 52 Cal. 4th 1171, 1178 (2011) (citing Cal. Civ. Code § 1619). "The terms of an express contract are stated in words" while "[t]he existence and terms of an implied contract are manifested by conduct." *Id.* (citing Cal. Civ. Code §§ 1620-1621); *see also Unilab Corp. v. Angeles-IPA*, 244 Cal. App. 4th 622, 636 (2016), as modified (Feb. 1, 2016) ("An implied-in-fact contract is based on the conduct of the parties.") (citing Cal. Civ. Code § 1621). "Like an express contract, an implied-in-fact contract requires an ascertained agreement of the parties." *Unilab Corp.*, 244 Cal. App. 4th at 636 (citing *Silva v. Providence Hospital of Oakland*, 14 Cal.2d 762, 773 (1939); 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 102, p. 144)). The existence of such an agreement is a question of fact. *Id.*

The California Supreme Court has recognized that "[e]ven when a written contract exists, '[e]vidence derived from experience and practice can . . . trigger the incorporation of additional, implied terms.'" *Retired Employees Assn. of Orange Cty., Inc. v. Cty. of Orange*, 52 Cal. 4th at 1178–79 (quoting *Scott v. Pacific Gas & Electric Co.*, 11 Cal.4th 454, 463 (1995) (internal quotations and citation omitted). The court explained, "[i]mplied contractual terms ordinarily stand on equal footing with express terms, provided that, as a general matter, implied terms should never be read to vary express terms." *Id.* (internal citations and quotations omitted); *see also Kucharczyk v. Regents of Univ. of California*, 946 F. Supp. 1419, 1432 (N.D. Cal. 1996) ("terms that conflict with an express written contract cannot be implied in a written contract.") (citing *Tollefson v. Roman Catholic Bishop*, 219 Cal.App.3d 843, 855 (1990)) ("there simply cannot exist a valid express contract on one hand and an implied contract on the other, each embracing the identical subject but requiring different results and treatment.").

---

[12] While Graham Beck asserts that the law of South Africa applies to Maritime's claims, the only challenges it brings to the sufficiency of Maritime's allegations are based on California contract law. Therefore, although the Court does not foreclose the possibility that Maritime's claims may be governed by South African law, the Court addresses only Graham Beck's assertions that under California law Maritime's claims fail.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Here, Graham Beck argues that because Maritime relies on the 2014 Draft Agreement in support of its claims it cannot also allege the existence of an implied-in-fact contract.  That argument fails for two reasons.  First, the 2014 Draft Agreement is unsigned and therefore is not an enforceable written contract; Maritime relies on the writing only as evidence of the parties' implied agreement and does not anywhere assert that it is an enforceable contract in and of itself.  Even if the 2014 Draft Contract were found to be an enforceable agreement, Graham Beck has not pointed to any aspect of the implied-in-fact agreement Maritime alleges existed between the parties that attempts to vary the meaning of any provision in the 2014 Draft Agreement and therefore has not demonstrated that Maritime's claim is insufficiently pled under California law.

Nor is Graham Beck's reliance on *Lance Camper Mfg. Corp. v. Republic Indem. Co*., 44 Cal. App. 4th 194, 203 (1996) persuasive.  In that case, the court stated that the plaintiffs' claim for unjust enrichment – which the court interpreted as a claim for breach of either an implied contract or quasi-contract (the court appeared to use the two terms interchangeably) – was inconsistent with its claim for breach of an enforceable written contract, stating that it "well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter."  44 Cal. App. 4th at 203 (citing *Wal-Noon Corp. v. Hill*, 45 Cal.App.3d 605, 613 (1975);  *Tollefson*, 219 Cal. App.3d at 855).  To the extent that the court in *Lance* relied on *Tollefson*, which made clear that an implied contract cannot exist if it *varies the terms* of an enforceable written contract, the Court concludes that the *Lance* court did not intend to pronounce a broader rule than is stated in *Tollefson*.  If it did, the rule is inconsistent with California law as articulated by the California Supreme Court (set forth above) and therefore this Court to declines to follow it.

### 3.   Whether Maritime States a Claim for Breach of the Covenant of Good Faith and Fair Dealing

Under California law, "[e]very contract imposes on each party a duty of good faith and fair dealing in each performance and its enforcement."  *Carson v. Mercury Ins. Co.*, 210 Cal. App. 4th 409, 429 (2012) (internal quotation marks omitted).  "The covenant 'is based on general contract law and the long-standing rule that neither party will do anything which will injure the right of the

other to receive the benefits of the agreement.'" *Rosenfeld v. JP Morgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010) (quoting *Waller v. Truck Ins. Exchange, Inc*., 11 Cal.4th 1, 36 (1995)).  In order to establish a breach of the covenant of good faith and fair dealing, a plaintiff must show: "(1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *Id.* (citing Judicial Council of California Civil Jury Instruction 325).

California courts have held that to prevail on such a claim, a plaintiff "must show that the conduct of the defendant . . .  demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc*., 222 Cal. App. 3d 1371, 1395 (1990), as modified on denial of reh'g (Oct. 31, 2001).   With respect to the intent required to establish a breach of the implied covenant, the California Supreme Court has held that "[a] party violates the covenant if it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable." *Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc*., 2 Cal. 4th 342, 372 (1992).  In *Carma*, the court recognized the difficulty of "defining what is consistent with good faith and fair dealing" and found that it was "more meaningful to concentrate on what is prohibited." *Id*.  Identifying principles that had emerged from the case law, the court noted that it is not "necessary that the party's conduct be dishonest. Dishonesty presupposes subjective immorality; the covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive." *Id*. at 373.

Graham Beck argues that Maritime has not sufficiently alleged this claim because it has not alleged that Graham Beck "acted with specific intent necessary to frustrate the purpose of the contract." Motion at 26.  That is not the standard, however.  Maritime must show that Graham Beck's conduct was deliberate and unreasonable and that it frustrated the terms of the contract.

Maritime has done so by alleging facts in its Complaint to show that Graham Beck abruptly ended its decade-long exclusive distributorship relationship with Maritime and began selling directly to Maritime's customers, as summarized at length above.

The Court also rejects Graham Beck's assertion that the Court should dismiss this claim on the pleadings because Maritime has also acted in bad faith, resulting in Graham Beck's action in South Africa to recover trade debt it contends is owed to it by Maritime. Motion at 26-27. This contention has nothing to do with the standard that applies to a Rule 12(b)(6) motion, as Graham Beck well knows. It is obvious that the parties disagree on the merits as to who acted reasonably and who did not. The only question before the Court at this stage, however, is whether the claim is adequately pled. The Court finds that it is.

## IV.    CONCLUSION

For the reasons stated above, the Motion is DENIED.

**IT IS SO ORDERED.**


Dated:   July 20, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California