UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HALCYON SYNDICATE LTD., LLC,<br><br>Plaintiff,<br><br>v.<br><br>GRAHAM BECK ENTERPRISES (PTY), LTD.,<br><br>Defendant. | Case No. 19-cv-04278-JCS<br><br>**ORDER DENYING MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**<br><br>Re: Dkt. No. 54 |

## I. INTRODUCTION

Plaintiff Halcyon Syndicate Ltd., LLC, d/b/a Maritime Wine Trading Collective ("Maritime") asserts claims for breach of an implied-in-fact contract and breach of the implied covenant of good faith and fair dealing against wine producer Graham Beck Enterprises, Ltd., ("Graham Beck"), based on Graham Beck's termination of the business relationship between the two companies. Presently before the court is Graham Beck's Motion to Compel Arbitration and Stay Litigation ("Motion"). The Court finds that the Motion is suitable for determination without oral argument and therefore vacates the motion hearing set for **January 8, 2021**. The Further Case Management Conference scheduled for the same date will remain on calendar but will be moved from 9:30 a.m. to 2:00 p.m. For the reasons set forth below, the Motion is DENIED.[1]

## II. BACKGROUND

### A. Allegations in the Complaint[2]

Maritime alleges that the relationship between the parties began in 2006, when Graham

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).
[2] To assist the reader, the Court reproduces here the summary of the allegations in the complaint contained in its order on Graham Beck's motion to dismiss. *See* Docket No. 42.

Beck hired Christopher Nickolopoulos, who is now the chief executive officer of Maritime, as Graham Beck's North American Business Director. Complaint ¶ 16. At that time, Maritime alleges, Graham Beck was operating its own import company within the United States, in Kentucky, "with no success." *Id*. ¶ 17. Maritime alleges that the parties agreed that Nickolopoulos would start a new import company, which would be based in San Francisco ("the center of the United States wine industry") and "act as Graham Beck's exclusive importer within the United States and would use [its] experience, sales, marketing and wholesaler relationships to grow sales and the brand." *Id*. ¶¶ 16, 19. That new company "would become known as Maritime and was formed in January 2009." *Id*. Maritime alleges that Graham Beck's business in the United States grew as a result of its efforts, with increased sales and growing brand recognition of Graham Beck's products. *Id.* ¶ 20.

Maritime alleges that between 2009 and 2019, "certain understandings and implied agreements were established by the practices, customs, norms, actions, conduct and mutual understanding of the parties." *Id*. ¶ 22. According to Maritime, "[n]o written contract was 'needed' because everyone 'knew' the deal." *Id*. For instance, although there was no written requirement that they do so, the parties met "at least annually to establish budgets, marketing plans, suggested resale prices, and strategies for the upcoming year." *Id.* ¶ 23. Maritime further alleges that the parties met quarterly to discuss the progress of the goals of the parties and that Graham Beck awarded Maritime bonuses for meeting the projected sales within the projected budget. *Id.* ¶ 24.

Maritime alleges that even without a written contract, the parties had an understanding that Maritime would be the exclusive importer of Graham Beck's wines, and that Maritime would not import any South African wines other than Graham Beck's. *Id*. ¶ 25. It also alleges that the parties knew and understood that this agreement could not be terminated without cause. *Id.* ¶ 26. As evidence of the implied agreement, Maritime points to a draft importation agreement that Graham Beck sent to Maritime via email on March 17, 2014 ("2014 Draft Agreement"). *Id.* ¶ 27. Maritime alleges that the substantive provisions of this agreement were, by Graham Beck's own admission, the best evidence of the parties' implied agreement. *Id.* ¶ 27. According to Maritime,

Graham Beck stated in the email that accompanied the draft contract that its "standard form required 'a great many amendments to bring it close to our business practice.'" *Id*.

Maritime's complaint points to several specific substantive provisions of the 2014 Draft Agreement that it alleges reflect the implied agreement between the parties. *Id.* ¶¶ 28-30. For example, "Maritime was expressly named as the exclusive importer of Graham Beck wines within the United States and Maritime expressly was to purchase no other South African wine other than Graham Beck wine." *Id.* ¶ 28. The 2014 Draft Agreement further provided that the parties would develop a budget, marketing strategies and pricing and that the parties would work together to achieve the annual sales budget and marketing plan, consistent with the parties' existing practice. *Id.* According to Maritime, the 2014 Draft Agreement also provided that it could be terminated only for cause, in recognition of the "growing interdependence and success, and the amount of resources Maritime had dedicated to growing the brand." *Id*. ¶ 29; *see also id.*¶ 30 ("This arrangement reflected the time, resources and money required by both parties (but especially be Maritime) to successfully bring a brand to market, expand the market, increase sales, and keep the brand relevant."). In particular, Section 2 of the agreement provided for an initial 5-year term, with automatic renewal for another 3-year period, subject to the termination provision in Section 10. *Id*. Section 10 provided that Graham Beck could terminate the agreement "if [Maritime] commits a breach . . . and such act continues without being remedied within 21 days after written notice has been discharged," or "if the Importer is liquidated . . or compounds with its creditors . . . ." *Id*.

Maritime alleges that it reviewed the contract and on May 11, 2014 sent an email to Graham Beck asking if it should sign the agreement then or wait until Graham Beck and Maritime met in the United States later in the year. *Id.* ¶ 31. Graham Beck again sent the contract to Maritime on December 23, 2014, stating in the email that accompanied it, "'as per our discussion' attached is the contract" and adding that "the 'version was OK with us at the time . . . but should still be OK.'" *Id.* ¶ 32. Maritime alleges that it never objected to the 2014 Draft Agreement and that the parties simply "never got around to signing the agreement." *Id*. ¶ 33. According to Maritime, "[f]or all concerned, growing the brand and sales took precedence over formalizing a

3

written contract and it was difficult to get the parties together for a signing due to the fact they were operating on different continents and constantly traveling around the United States and internationally to promote the Graham Beck wines and brand." *Id.*

Maritime alleges that Graham Beck breached the parties' implied contract when on June 14, 2019, Chris du Toit, Graham Beck's new chief executive officer, sent a notice of termination, ending the parties' relationship on three-month's notice. *Id.* ¶¶ 47, 56. Additionally, Maritime alleges that Graham Beck began reaching out to new distributors even before the three-month period discussed in the notice and that Graham Beck's post-termination actions damaged Maritime's business by disrupting its relationships with its network of distributors and buyers. *Id.* ¶¶ 49-50.

Maritime alleges that "[e]ven if the conduct, actions, norms and understandings of the parties does not evidence an implied agreement that the term of the agreement would be perpetual, terminable only for cause, at the very minimum the implied covenant of good faith and fair dealing requires a 'reasonable notice' before the parties agreement could be terminated." *Id.* ¶ 63. Under the circumstances, it alleges, reasonable notice required that Maritime be given at least three years notice of Graham Beck's intent to terminate the parties' agreement. *Id.* ¶ 65.

Maritime alleges that it has fully complied with the terms of the parties' implied agreement and that Graham Beck breached the implied covenant of good faith and fair dealing by abruptly terminating the implied agreement without cause on just three months' notice. *Id.* ¶¶ 66-67. It alleges that Graham Beck further breached the implied-in-fact contract by announcing the termination to United States wholesale distributors and by selling wine directly to those wholesale distributors within the United States. *Id.* ¶ 67. As a result, Maritime alleges it has suffered damages of at least $3,000,000. *Id.* ¶ 68.

**B.     Procedural Background**

This case was filed on July 25, 2019. On October 7, 2019, Graham Beck filed a claim in the High Court of South Africa against Maritime in an action captioned as Graham Beck Enterprises (PTY) Ltd. v. Halcyon Syndicate Ltd., South Africa, Case No. 16996/2019 (hereinafter "South Africa Action"). *See* Declaration of Chris du Toit in Support of Defendant

Graham Beck's Motion to Dismiss du Toit ("du Toit Decl.") ¶ 27 & Ex. I (Graham Beck's Amended Intendit). Graham Beck was served in the instant action on November 14, 2019 under the Hague Convention. *See* Dkt. No. 13. On January 24, 2020, the parties submitted a Joint Case Management Statement. Dkt. No. 24. Graham Beck stated that it intended to bring a motion to dismiss challenging jurisdiction and venue, asking that the case be transferred to South Africa, and seeking dismissal of Maritime's claims under Rule 12(b)(6). *Id.* at 14. It stated further that "[s]hould the Court deny Defendant's Motion to Dismiss, Defendant anticipate[d] filing a Motion for Summary Judgment." *Id.* Graham Beck made no mention of an intent to bring a motion to compel arbitration. It denied the existence of a written contract. *Id.* at 10-11.

According to Maritime, "[i]n anticipation of the Motion to Dismiss . . . on February 14, 2020, Graham Beck served twenty-five requests for admission, twenty-five requests for production of documents and twenty-five interrogatories." Opposition at 13. Maritime further represents that it responded to Graham Beck's discovery and served its own requests for production of documents and interrogatories. *Id*. Graham Beck noticed the depositions of both Christopher Nickolopoulos and Elijah Pfister for March 13, 2020 but those depositions were cancelled "at the last minute" due to the COVID pandemic." *Id.*

On April 29, 2020, Graham Beck brought a motion to dismiss, arguing that the case should be dismissed based on lack of personal jurisdiction, improper venue and *forum conveniens*. Dkt. No. 30. Graham Beck also argued that both of the claims asserted in the complaint – for breach of contract based on an implied-in-fact contract and breach of the implied covenant of good faith and fair dealing – were insufficiently pled under Rule 12(b)(6) of the Federal Rules of Civil Procedure and should be dismissed with prejudice. *Id.* The Court denied the motion on July 20, 2020. Dkt. No. 42. Among other things, the Court rejected Graham Beck's argument that because Maritime relies on the 2014 Draft Agreement in support of its claims it cannot also allege the existence of an implied-in-fact contract. *Id.* at 38. In doing so, the Court found that the 2014 Draft Agreement is unsigned and therefore is not an enforceable written contract, noting that "Maritime relies on the writing only as evidence of the parties' implied agreement and does not anywhere assert that it is an enforceable contract in and of itself. *Id.*

5

On July 10, 2020, Maritime filed an updated case management conference statement. Dkt. No. 39. Although Maritime attempted to meet and confer with Graham Beck in order to submit a joint statement, Graham Beck did not respond to Maritime's proposed statement, which Maritime therefore filed separately. *Id.* at 2.

Graham Beck filed its answer on August 3, 2020. Dkt. No. 43. It did not assert an affirmative defense based on an agreement to arbitrate in its answer. *Id.* On August 17, 2020, the parties submitted a joint case management conference statement in which they proposed a schedule for discovery, dispositive motions and trial. *Id.* Again, there was no suggestion from Graham Beck that it intended to bring a motion to compel arbitration.

On August 18, 2020, the Court referred the case to Early Neutral Evaluation ("ENE"), dkt. no. 46, and according to a Joint Case Management Conference Statement filed on October 9, 2020, the ENE was scheduled to occur on November 18 and 20, 2020. Dkt. No. 53. The October 9, 2020 case management conference statement again made no mention of any intent on Graham Beck's part to compel arbitration. Yet less than a week later, on October 15, 2020, Graham Beck filed the instant motion. Dkt. No. 54.

### C. Graham Beck's Motion to Compel Arbitration

In the Motion, Graham Beck argues that because Maritime relies on the 2014 Draft Agreement in support of its claims, the Court should enforce the arbitration clause contained in that agreement under the doctrine of equitable estoppel. Motion at 12-13.[3] Maritime contends the doctrine of equitable estoppel does not apply and argues that in any event, Graham Beck has

---

[3] The arbitration clause provides as follows:

> Any dispute, difference or question which may arise at any time hereafter between the Company and the Importer touching the true construction of this agreement or the rights and liabilities of the parties hereto shall, except as provided by clauses 16.2 and 16.3 hereof or unless otherwise herein expressly provided, be referred to the decision of a single arbitrator in Cape Town, Republic of South Africa, to be agreed upon between the parties, or, in default of agreement for 14 (FOURTEEN) days to be appointed at the request of either party by a specialist arbitrator in accordance with, and subject to, the provisions of the Arbitration Act 42 of 1965 or any statutory modification or re-enactment thereof for the time being in force.

Du Toit Decl., Ex. A (2014 Draft Agreement) ¶15.1.

waived the right to seek arbitration.

## III. ANALYSIS

"[A] party has waived its right to arbitrate a dispute . . . if it (1) had knowledge of its existing right to compel arbitration, (2) acted inconsistently with that existing right, and (3) the party resisting arbitration suffered prejudice from the defendants delay in moving to compel arbitration." *Freaner v. Valle*, 966 F. Supp. 2d 1068, 1085 (S.D. Cal. 2013) (citing *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 720-21 (9th Cir.2012)). Because all three of these requirements have been met here, the Court finds that Graham Beck has waived any right it may (or may not) have had to seek arbitration.[4]

First, Graham Beck's ground for seeking arbitration is Maritime's reliance on the 2014 Draft Agreement. *See* Motion at 7-8 (citing Complaint ¶¶ 25-30, 36). That ground was apparent from the outset of the case. Graham Beck's argument in its Reply brief that it acted diligently because its right to compel arbitration arose on August 3, 2020 is virtually incoherent. *See* Reply at 4-5. To the extent that Graham Beck seems to be relying on arguments Maritime made in its Opposition to the motion to dismiss, that brief was filed many months earlier, on May 13, 2020. Graham Beck does not explain why the five-month delay *after* Maritime filed the brief that purportedly gave rise to a right to seek arbitration is consistent with its position that it acted diligently.

Furthermore, the distinction Graham Beck attempts to draw between the allegations in the complaint and the arguments in Maritime's opposition to show that it was not aware of its right to seek arbitration until the latter was filed is based on mischaracterizations of both. The single sentence cited by Graham Beck to show that its right to compel arbitration arose when Maritime filed its opposition to the motion to dismiss states as follows: "While an implied-in-fact agreement cannot conflict with an enforceable express contract, each of the cases relied upon by Graham Beck are inapposite because, here, (a) there is no express, enforceable contract, and (b) even if there were, the implied agreement is consistent with the unsigned draft contract from

---

[4] The Court declines to reach Graham Beck's argument that under the doctrine of equitable estoppel the arbitration clause in the unsigned 2014 Draft Agreement should be enforced.

7

2014." Reply at 5 (citing ECF No. 31, p. 24:18-19). This argument is entirely consistent with Maritime's allegations in the complaint that the substantive provisions of the 2014 Draft Agreement are the "best evidence" of the parties' agreement that their relationship would only be terminated for cause. *See* Complaint ¶¶ 25-30. In short, Graham Beck has known that Maritime intended to rely on the substantive provisions of the 2014 Draft Agreement – which includes the arbitration clause upon which Graham Beck relies – since it received a copy of the complaint, in early August 2019.[5]

Second, Graham Beck has, for over a year, acted inconsistently with any right it contends it has to arbitration. Even before the complaint was formally served on Graham Beck, it filed a competing action in a South African court rather than pursuing arbitration there, as it contends the arbitration clause in the 2014 Draft Agreement requires. In this Court, Graham Beck repeatedly failed to raise the question of arbitration in its Case Management Conference Statements, instead stipulating to a proposed litigation schedule that did not include a motion to compel arbitration; it began engaging in discovery in February 2020 and Maritime has responded to that discovery. Graham Beck also noticed depositions, which were scheduled to occur in March 2020 and were cancelled only at the last minute due to the covid pandemic. Then on April 29, 2020, Graham Beck brought a motion to dismiss challenging not only jurisdiction and venue but also the sufficiency of Maritime's pleadings under Rule 12(b)(6). When it lost that motion, on July 20, 2020, it continued to conduct itself in a manner inconsistent with arbitration, filing an answer on August 3, 2020 that made no mention of arbitration. Almost three months after the Court's ruling on the merits on Graham Beck's motion to dismiss, on October 9, 2020, the parties updated the Court on the status of the scheduled ENE and Graham Beck *still* made no mention of its intent to bring a motion to compel arbitration. Graham Beck's active litigation of this case for over a year after it knew of the purported right to arbitration, including seeking key merits rulings on

---

[5] Although Graham Beck was not formally served until November 14, 2019, it does not dispute Maritime's representation in its October 21, 2019 Case Management Conference Statement that a copy of the complaint was sent to Graham Beck and its attorney at the time the complaint was filed and that within a week Graham Beck's counsel contacted Maritime's counsel to inform Maritime that Graham Beck refused to waive service. *See* Dkt. No. 11 at 2.

Maritime's claims, is inconsistent with such a right. *See Martin v. Yasuda*, 829 F.3d 1118, 1126 (9th Cir. 2016) (holding that the defendant had acted inconsistently with right to arbitrate by litigating the case for seventeen months, including "devoting 'considerable time and effort' to a joint stipulation structuring the litigation, filing a motion to dismiss on a key merits issue, entering into a protective order, answering discovery, and preparing for and conducting a deposition[,]" and by failing to "note their right to arbitration until almost a year into the litigation" and waiting "to enforce that right until well after that time.").

Finally, Maritime is unquestionably prejudiced by Graham Beck's delay. "Prejudice refers to the inherent unfairness of delay, expense, or damage to a party's legal position that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." *Freaner*, 966 F.Supp.2d at 1085. Here, Maritime has devoted considerable time and resources to litigating in this forum; moreover, if the case were referred to arbitration Maritime likely would be forced to duplicate its efforts by defending against the same substantive challenges this Court already rejected. *See Hooper v. Advance Am., Cash Advance Centers of Missouri, Inc.*, 589 F.3d 917, 923 (8th Cir. 2009) ("Although prejudice manifests itself in myriad ways, prejudice results when . . . parties . . . litigate substantial issues on the merits, or when compelling arbitration would require a duplication of efforts.") (internal quotations and citations omitted)

For these reasons, Graham Beck has waived any purported right to arbitrate the disputes in this case.

## IV. CONCLUSION

The Motion is DENIED.

**IT IS SO ORDERED.**

Dated: December 22, 2020

_____
JOSEPH C. SPERO
Chief Magistrate Judge

9